**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**WILLIAM T. ALLEN,**

          **CASE NO. 2:12-CV-154**

    **Petitioner,**             **Judge Sargus
                             Magistrate Judge King**

    **V.**

**WARDEN, TOLEDO CORRECTIONAL
INSTITUTION,**

    **Respondent.**

**REPORT AND RECOMMENDATION**

    Petitioner, a state prisoner, brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  This matter is before the Court on the *Petition*, Doc. No. 2, Respondent's *Return of Writ*, Doc. No. 8, Petitioner's *Reply,* Doc. No. 14, the parties' supplement to the record, Doc. Nos. 16, 17,  and the exhibits of the parties.  For the reasons that follow, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED**.

**FACTS and PROCEDURAL HISTORY**

    The Ohio Fifth District Court of Appeals summarized the facts and procedural history of this case as follows:

> On June 11, 2000, at approximately 10:00 p.m., Norman "Duck" Herrell was at his home talking on the telephone with his ex-wife, Phyllis Gaskins. A knock on the door at Herrell's house interrupted the conversation. Herrell told Gaskins that he would call her back, but he never called.
>
> The next morning, Herrell did not report to work at his furniture store, J & D furniture. His son, Michael Herrell, became concerned, and tried repeatedly to call his father throughout the day. When he still could not reach Herrell by the afternoon,

1

Michael went to Herrell's house to check on him.

Michael testified at trial that when he arrived at Herrell's house, the door was unlocked and there were blankets hanging over the windows in the living room. Michael stated that his father was an immaculate housekeeper and that when he entered the home on June 12th, the house was a mess, it appeared to have been ransacked, and Herrell's gun cabinet was open and his guns were missing. Michael found his father lying face down on the floor in a pool of blood in the basement. He called 911.

Upon arrival, the officers searched the home for additional victims or suspects. No one else was found to be in the residence. They also checked for, but did not find, evidence of a forced entry.

After determining that Herrell's death was a homicide, the Delaware Police Department contacted the Ohio Bureau of Criminal Investigation (B.C.I.) for assistance in processing the crime scene.

While processing the scene, officers recovered several pieces of evidence. They recovered two knives, including a small brown knife from the love seat in the basement, which appeared to have blood on it. After DNA tests were run on the knife, it was determined that, the blood present on the knife was that of Herrell.

They also recovered a pair of brown cloth gloves, which were saturated with blood. DNA recovered from those gloves matched both Herrell's DNA and subsequently that of Allen. Additionally, authorities recovered a long-sleeved blue shirt that later was determined to possess the DNA of Allen, as well as his wife, Silvy Allen.[FN2]

FN2. The record reflects that the Allens were married in 2005.

Officers also recovered a guest receipt from a Meijer store in Oregon, Ohio, which is near Toledo. They were able to determine that a person who identified himself as K.W. Yowpp made the purchase and a return on June 9, 2000 [FN3]. K.W. Yowpp is a

known alias of Brenson. Brenson's fingerprint was retrieved from the receipt.

FN3. 15T. at 2233

Brenson's fingerprint was also recovered from an envelope at Herrell's house containing a dog tag.

While searching Herrell's home, authorities observed that many items in the house had been disturbed, including pictures taken off walls, chairs moved from the kitchen to rooms that had blankets over the windows, rooms that had been ransacked, as if the intruder(s) were looking for something. They also observed a large quantity of illegal fireworks in the basement of the house.

Several days following the initial search of Herrell's house, authorities returned to the home after learning that Herrell had a safe hidden in the house. Herrell's family had not disclosed to the authorities that the safe existed, but after authorities asked about the safe, Herrell's daughter, who was the only person besides Herrell with the combination to the safe, opened it for them. Contained within the safe were silver coins, old stopwatches, a deed to rental property owned by Herrell, and some jewelry.

Franklin County Deputy Coroner, Dorothy Dean, testified that Herrell had been stabbed fifty-one times. Three of the stab wounds were potentially fatal.

During the investigation of Herrell's murder, officers discovered that Herrell and Brenson spent several months in prison together at Marion Correctional Institution in 1981. Herrell's children were also familiar with Brenson, having seen him with Herrell before. Herrell's children identified Brenson as "Muhammad."

Sometime in 2001, officers learned that Ohio Highway Patrol Trooper Brandon Spaulding stopped Brenson during the evening hours of June 11, 2000, on U.S. 23 South in the area of Bucyrus, Ohio. Trooper Spaulding testified at trial that he was running license plates on vehicles at a rest area, when he ran the license

plate on Brenson's red Ford F-150 at approximately 8:51 p.m. The truck was registered to Mustafa Muhammad, which was Brenson's son's name. At that time, Trooper Spaulding believed that the license plate on the truck actually belonged on a different vehicle. The trooper pulled his cruiser up behind Brenson's vehicle and got out of his cruiser to approach Brenson. Upon approaching Brenson, Trooper Spaulding noted that Brenson was sitting in the vehicle alone.

Trooper Spaulding determined that he had conveyed one of the letters on the license plate incorrectly to the dispatcher, and started to explain the mistake to Brenson. Brenson became angry and began swearing at the trooper, claiming that the trooper was harassing him because of his race. Trooper Spaulding noticed that Brenson's front license plate was in the dashboard. He warned Brenson to attach the license plate to the front of the vehicle. Eight minutes after he initiated the stop, Trooper Spaulding cleared the call and left the rest stop.

According to Brenson [FN4], he then went to the next exit to obtain materials to attach the license plate to the front of the truck. Brenson testified in 2002 and 2008 before the Delaware County grand jury that he was on his way to Delaware, Ohio, to purchase fireworks from Herrell. He also stated in his 2008 grand jury testimony that he purchased zip ties to secure the license plate to the front of the truck [FN5].

FN4. Brenson did not testify at trial. He did, however, testify twice before the Delaware County Grand Jury. He first testified on April 18, 2002. He testified a second time on April 15, 2008. Additionally, he agreed to meet with police detectives for an interview on January 14, 2003. It is from a combination of these three occasions that the prosecution introduced various statements made by Defendant Brenson at trial.

FN5. The prosecution attempted to demonstrate that a search of Brenson's vehicle in October 1999 yielded similar plastic zip ties in order to show that he did not purchase the plastic ties because of the June 11, 2000 traffic encounter with Trooper Spaulding. (12T. at 1390; 1395).

4

In March 2001, the police recovered Brenson's truck, and found no blood in the truck. They did find that his front license plate was attached to the front of the truck with a coat hanger.

At trial, Phyllis Gaskins testified that when she was speaking on the phone with Herrell on the night of June 11, 2000, he told her that two "white guys" were at the door. She later retracted her statement, claiming that Herrell would not have called the men "white guys." Brenson later told authorities that he saw a van with two white guys come up to Herrell's house as he was leaving. He claimed they were in a white van with Cuyahoga County license plates on it.

Brenson stated, through his grand jury testimony, that he left Herrell's house that night and returned to Toledo, arriving home around 11:00 or 12:00 that night.

Brenson also testified before the grand jury that he and Allen had been friends since 1979, that they both lived in Toledo, and that they had taken numerous trips together over the years. At trial, the prosecution called numerous friends and family members of Brenson to testify that they had seen Brenson with Allen multiple times throughout the years.

In October 2005, Allen became linked to Brenson through an informant. Allen reported being the victim of a felonious assault. As a result, the police obtained a blood sample from Allen. Subsequently, police were able to link Allen's DNA to the shirt found in Herrell's kitchen. Allen was also found to have a 1-in-30 chance of being a contributor to the DNA found on the blood-soaked cloth gloves in Herrell's kitchen.

Prior to being informed that his DNA was found at the scene of a crime, during an interview with the police in 2005 when he was the victim of a felonious assault, Allen informed the police that he was good friends with Brenson, whom he knew as "Muhammad." When the police showed Allen a photograph of Herrell, his demeanor noticeably changed; he looked at the picture and stated

that he did not know him.

A car dealer in Toledo testified at trial that in April 2000, Allen purchased a car for $600 and then sold it back in July 2000 for $200. Silvy Allen's daughter, Shanica Masadeh, testified at trial that Silvy and Allen suddenly moved to Florida in July 2000, and that Silvy gave custody of her to Silvy's grandmother because Silvy could not support her. The police obtained records from Florida that Allen and Silvy both worked for a temporary agency from August 8, 2000, to December 20, 2000.

Brenson's first defense attorney, Thomas Beal, testified at trial that he had a conversation with the Delaware County Prosecutor on December 3, 2000, that the indictment against Brenson would be dismissed, most likely by December 15, 2000. Allen then returned to Ohio in late December, 2000.

James Brenson was originally indicted for the murder of Herrell in Delaware County Common Pleas Case Number 00-CR-I-07-0195 on July 28, 2000. That case was dismissed without prejudice on January 16, 2001, at the request of the prosecution for further investigation.

Seven years later, a second indictment was issued on April 16, 2008, wherein both Brenson and Allen were indicted on two counts of aggravated murder, unclassified felonies, in violation of R.C. 2903.01(A) and R.C. 2903.01(B), respectively, one count of murder, an unclassified felony, in violation of R.C. 2903.02(B), one count of kidnapping, a felony of the first degree, in violation of R .C. 2905.01(A)(2), one count of kidnapping, a felony of the first degree, in violation of R.C. 2905.01(A)(3), one count of aggravated robbery, a felony of the first degree, in violation of R.C. 2911.01(A)(3), and one count of aggravated robbery, a felony of the first degree, in violation of R.C. 2911.01(A)(1).

Following their convictions, both defendants were sentenced to an aggregate of thirty years to life in prison.

Appellant Allen raises five Assignments of Error:

"I. APPELLANT'S SIXTH AMENDMENT RIGHT TO CONFRONT THE WITNESSES AT HIS TRIAL AND HIS FOURTEENTH AMENDMENT RIGHT TO A FAIR TRIAL WERE VIOLATED BY THE ADMISSION OF HIS NON-TESTIFYING CO-DEFENDANT'S STATEMENTS AT TRIAL.

"II. THE JOINDER OF DEFENDANTS SUBSTANTIALLY PREJUDICED APPELLANT'S DUE PROCESS RIGHT TO A FAIR TRIAL UNDER THE UNITED STATES CONSTITUTION AS IT PREVENTED THE JURY FROM MAKING A RELIABLE JUDGMENT ABOUT HIS GUILT OR INNOCENCE.

"III. THE PARADING OF APPELLANT'S WIFE, WHO WAS INCOMPETENT TO TESTIFY, BEFORE THE JURY AND THEN ADVISING THEM SHE WOULD NOT TESTIFY VIOLATED APPELLANT'S SIXTH AMENDMENT RIGHT TO CONFRONT WITNESSES AND HIS FOURTEENTH AMENDMENT RIGHT TO A FAIR TRIAL AS THE ACT CREATED AN UNFAVORABLE INFERENCE THAT THE WITNESS AND APPELLANT ENGAGED IN CRIMINAL CONDUCT, OR THAT THE WITNESS HAS EVIDENCE WHICH INCULPATES APPELLANT.

"IV. THE STRIKING FROM THE RECORD OF THE IRRELEVANT AND INADMISSIBLE EVIDENCE REGARDING THE EXECUTION OF A SEARCH WARRANT ON MR. BRENSON'S VEHICLE BY LIEUTENANT GORNEY WAS INSUFFICIENT TO PROTECT APPELLANT'S RIGHT TO A FAIR TRIAL UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND THE TRIAL COURT SHOULD HAVE GRANTED A MISTRIAL.

"V. THE CUMULATIVE EFFECT OF THE ERRORS SET FORTH ABOVE DEPRIVED THE APPELLANT OF HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL."

*State v. Allen,* No. 2009-CA-13, 2010 WL 3784818, at *1-4 (Ohio App. 5th Dist. Sept. 28,

7

2010).[1]  On September 28, 2010, the appellate court affirmed the judgment of the trial court.  *Id*.
On February 2, 2011, the Ohio Supreme Court dismissed Petitioner's subsequent appeal.  *State v.
Allen*, 127 Ohio St.3d 1535 (2011).

On January 6, 2012, Petitioner filed an application to reopen the appeal pursuant to Ohio
Appellate Rule 26(B).  He asserted that he was denied the effective assistance of appellate
counsel because his attorney failed to raise on appeal a claim of prosecutorial misconduct and
ineffective assistance of trial counsel.  *Exhibit 26 to Return of Writ*.  On February 14, 2012, the
appellate court denied Petitioner's Rule 26(B) application.  *Exhibit 29 to Return of Writ*.
Although Petitioner indicates that he filed an appeal from that decision to the Ohio Supreme
Court, and has attached what appears to be a copy of that appeal, *see Exhibits to Traverse*,
Respondent has provided a supplemental response which indicates that the Ohio Supreme Court
never received such an appeal.  *See Supplemental Response*, Doc. No. 16.

On February 21, 2012, Petitioner filed  the *pro se* petition for a writ of habeas corpus
pursuant to 28 U.S.C. § 2254.  He alleges that he is in the custody of the Respondent in violation
of the Constitution of the United States based on the following grounds:

> 1.  Appellant's Sixth Amendment right to confront the
>     witnesses at his trial and his Fourteenth Amendment
>     right to a fair trial were violated by the admission of
>     his non-testifying co-defendant's statements at trial.

---

[1]  Petitioner disputes the factual findings of the state appellate court, contending that its
factual findings are not entitled to a presumption of correctness under 28 U.S.C. § 2254(e),
because the appellate court failed to make those findings on direct appeal.  *See Reply*.  In support
of this argument, and in support of his claims for relief, Petitioner has attached various exhibits
to his *Reply* .  The record fails to reflect, however, that Petitioner has met his burden of rebutting
the presumption of correctness accorded to the factual findings of the state appellate court.

2.    The joiner of defendants substantially prejudiced the appellant's due process rights to a fair trial under the U.S. Constitution as it prevent[ed] the jury from making a reliable judgment about his innocence or guilt.

3.    The parading of appellant's wife, who was incompetent to testify before the jury, who had a hostile attitude, openly towards the prosecutors, then advising jurors she would not be testifying created an unfavorable inference that she and the appellant engaged in  criminal conduct, or that she has evidence which inculpates appellant.

4.    The striking from the record of the irrelevant and inadmissible evidence regarding the execution of a search warrant on Mr. Brenson's vehicles by Lt. Gorney, over a year before, was insufficient to protect the appellant's rights to a fair trial under the Fourteenth Amendment to the U.S. Constitution and the trial court should have granted a mistrial.

5.    The cumulative effects of the errors set forth above deprive the appellant of his constitutional rights to a fair trial.

6.    Prosecutor's misconduct.

7.    Ineffective assistance of trial counsel and ineffective assistance of appellate counsel.

It is the position of the Respondent that Petitioner's claims are procedurally defaulted, fail to present a cognizable habeas corpus claim or are without merit.

**CLAIM ONE**

In claim one, Petitioner asserts that he was denied his right to confront witnesses against

9

him by the admission of his non-testifying co-defendant's statements at trial.  The state appellate

court rejected this claim as follows:

> In the first assignment of error, appellant argues that it was error for the trial court to allow statements of his non-testifying codefendant, Brenson, at trial. In so doing, he argues that the trial court violated his right to confront witnesses against him under the Sixth Amendment to the U.S. Constitution and his right to a fair trial under the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

> Specifically, appellant cites solely to "[t]he redacted Grand Jury Transcripts of Mr. Brenson's testimony before the Delaware County, Ohio Grand Jury on April 18, 2002 and April 15, 2008 [that] was admitted at trial against Appellant. In those statements Mr. Brenson specifically refers to Appellant by name stating that he knew Appellant and they were good friends. *Transcript Vol. XIII,* page 1855, line 16, page *1857,* line 17. Mr. Brenson testified that he has known Appellant since 1979, that they are close friends, that Appellant worked for him and that they went on trips together, specifically to Arizona in the early 1990's. *Id.*" [Appellant's Brief at 23]. Appellant does not cite nor does he take exception to any other statement made by Brenson. [See, Appellant's Brief at 23-24].

> "Ordinarily when, at a joint trial, a co-defendant's prior statement, testimonial or otherwise, is introduced only against the declarant-co-defendant, and not against the complaining co-defendant, the latter has suffered no violation of his Sixth Amendment Confrontation Clause rights." *United States v. Vasilakos* (6th Cir. 2007), 508 F.3d 401, 407. The Supreme Court has recognized an exception to this general rule where a co-defendant's statement facially incriminates the defendant. *Bruton v. United States* (1968), 391 U.S. 123, 135-36, 88 S.Ct. 1620, 20 L.Ed.2d 476. The statements in the case at bar never inculpate either Brenson or Allen; rather the statements assigned as error only allude to the fact that the two knew each other, a fact corroborated by at least four other witnesses and the appellant. Specifically, Detective Leatherman testified that he spoke to appellant at his residence (14T. at 2032). He showed him some unmarked photographs ( *Id.*

10

at 2033). The first photograph he showed Allen was of Mr. Brenson ( *Id.* at 2033). Allen identified the photograph as "Muhammad" ( *Id.* at 2033). Allen indicated that he and Brenson were friends ( *Id.* at 2034). Appellant indicated that he and Brenson were "good" or "close" friends ( *Id.* at 2034). Appellant indicated that he and Brenson had known each other for "quite awhile" ( *Id.* at 2034).

Accordingly, it can hardly be argued that Brenson's statement that he knew Allen amounted to constitutional error.

Where, however, "the contested statement is not incriminating to a defendant on its face, but is only so when linked with other evidence at trial, a trial court's limiting instruction is enough to restrain the jury from considering the statement for a purpose that would violate the defendant's right to confrontation." *State v. Wilkerson,* 10th Dist. No. 01 AP-1127, 2002-Ohio-5416, ¶ 4., citing *State v. Laird* (1989), 65 Ohio App.3d 113, 115-17, 583 N.E.2d 323, following *Richardson v. Marsh* (1987), 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176. *State v. Jennings,* Franklin App. Nos. 09 AP-70, 09 AP-75, 2009-Ohio-6840 at ¶ 71.

In the case at bar, before deliberations, the trial court specifically admonished the jury that "Evidence may be admitted against one defendant, even though it must not be considered as evidence against the other defendant. You must carefully separate such evidence and consider it only as to the defendant to whom it applies.

"A statement by one defendant made outside the presence of the other defendant is admissible as to the defendant making such statement and must not be considered for any purpose as evidence against the other defendant.

"You must decide separately the question of whether one or both defendants are guilty or not guilty. If you cannot agree on a verdict as to both defendants, but do agree as to one, you must render a verdict as to the one upon whose guilty or not guilty finding you agree." (17T. at 2588).

Appellant did not object to these instructions nor does he challenge the clarity of these instructions. Accordingly, these instructions were sufficient to restrain the jury from considering the statement for a purpose that would violate the defendant's right to confrontation.

Nor do we find the admission of the statement to have affected appellant's substantial rights. In *State v. Fisher,* 99 Ohio St.3d 127, 2003-Ohio-2761, 789 N.E.2d 222, the Ohio Supreme Court recognized that "[i]n *Arizona v. Fulminante* (1991), 499 U.S. 279, 306-312, 111 S.Ct. 1246, 113 L.Ed.2d 302, the United States Supreme Court denominated the two types of constitutional errors that may occur in the course of a criminal proceeding-'trial errors,' which are reviewable for harmless error, and structural errors, which are per se cause for reversal. * * * Trial error is error which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt. * * * Structural errors, on the other hand, defy analysis by 'harmless error' standards because they affect the framework within which the trial proceeds, rather than simply [being] an error in the trial process itself. [ *Fulminante* ] at 309 and 310, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302. Consequently, a structural error *mandates* a finding of per se prejudice." *Fisher* at ¶ 9. (Internal quotation marks omitted). *See, also, State v. Wamsley*, 117 Ohio St.3d 388, 884 N.E.2d 45, 2008-Ohio-1195 at ¶ 15. In *Wamsley,* the Ohio Supreme Court noted,

"We have previously held that if the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other constitutional[l] errors that may have occurred are subject to harmless-error analysis. *State v. Hill* (2001), 92 Ohio St.3d 191, 197, 749 N.E.2d 274), quoting *Rose v. Clark* (1986), 478 U.S. 570, 579, 106 S.Ct. 3101, 92 L.Ed.2d 460. Moreover, as we stated in *State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, [c]onsistent with the presumption that errors are not structural, the United States Supreme Court ha[s] found an error to be structural, and thus subject to automatic reversal, only in a very limited class of cases. *Johnson v. United States,* 520 U.S. 461, 468, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) (citing *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963)

12

(complete denial of counsel)); *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) (biased trial judge); *Vasquez v. Hillery,* 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986) (racial discrimination in selection of grand jury); *McKaskle v. Wiggins,* 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984) (denial of self-representation at trial); *Waller v. Georgia*, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984) (denial of public trial); *Sullivan v. Louisiana,* 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) (defective reasonable-doubt instruction)." *Perry,* 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 18, quoting *Neder v. United States* (1999), 527 U.S. 1, 8, 119 S.Ct. 1827, 144 L.Ed.2d 35." *State v. Wamsley, supra* 117 Ohio St.3d at 391-392, 884 N.E.2d at 48-49, 2008-Ohio-1195 at ¶ 16. [Internal quotation marks omitted].

In *Wamsley, supra,* the Ohio Supreme Court further noted, "this court has rejected the concept that structural error exists in every situation in which even serious error occurred. See *State v. Hill,* 92 Ohio St.3d at 199, 749 N.E.2d 274, quoting *Johnson v. United States,* 520 U.S. at 466, 117 S.Ct. 1544, 137 L.Ed.2d 718. In *Johnson,* a criminal defendant argued that an unobjected-to error was structural, and therefore outside the plain-error strictures of Fed.R.Crim.P. 52(b), Ohio's Crim.R. 52(B) counterpart. The *Johnson* court * * * found that it had no authority to create a 'structural error exception' to the rule, and seemed to hold that, in direct appeals from federal convictions, a structural error analysis is inappropriate in a plain-error situation. *Hill* at 199, 749 N.E.2d 274, quoting *Johnson,* 520 U.S. at 466, 117 S.Ct. 1544, 137 L.Ed.2d 718." *Wamsley* 117 Ohio St.3d at 392, 884 N.E.2d at 50, 2008-Ohio-1195 at ¶ 18. (Internal quotation marks omitted).

In Ohio, Crim.R. 52 gives appellate courts narrow power to correct errors that occurred during the trial court proceedings. Crim.R. 52(A), which governs the criminal appeal of a non-forfeited error, provides that "[a]ny *error * * ** which does not *affect substantial rights* shall be disregarded." (Emphasis added.) Thus, Crim.R. 52(A) sets forth two requirements that must be satisfied before a reviewing court may correct an alleged error. First, the reviewing court must determine whether there was an "error" -- i.e., a "[d]eviation from a legal rule." *United States v. Olano*, (1993), 507 U.S. 725, 732-733, 113 S.Ct. 1770, 123 L.Ed.2d 508. Second, the reviewing court must engage in a specific analysis of the trial court

record -- a so-called "harmless error" inquiry -- to determine whether the error "affect[ed] substantial rights" of the criminal defendant. In *United States v. Dominguez Benitez* (June 14, 2004), 542 U.S. 74, 124 S.Ct. 2333, 159 L.Ed.2d 157, the Court defined the prejudice prong of the plain error analysis. "It is only for certain structural errors undermining the fairness of a criminal proceeding as a whole that even preserved error requires reversal without regard to the mistake's effect on the proceeding. See *Arizona v. Fulminante,* 499 U.S. 279, 309-310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (giving examples). Otherwise, relief for error is tied in some way to prejudicial effect, and the standard phrased as 'error that affects substantial rights,' used in Rule 52, has previously been taken to mean error with a prejudicial effect on the outcome of a judicial proceeding. See *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). To affect "substantial rights," ..., an error must have "substantial and injurious effect or influence in determining the ... verdict." *Kotteakos,* supra, at 776." *United States v. Dominguez Benitez, supra* 542 U.S. 74, 81, 124 S.Ct. at 2339. See, also, *State v. Barnes* (2002), 94 Ohio St.3d 21, 759 N.E.2d 1240; *State v. Fisher,* 99 Ohio St.3d 127, 129, 2003-Ohio-2761 at ¶ 7, 789 N.E.2d 222, 224-225. Thus, a so-called "[t]rial error" is "error which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." *Fulminante,* 499 U.S. at 307-308, 111 S.Ct. 1246, 113 L.Ed.2d 302. *State v. Naugle* (2009), 182 Ohio App.3d 593, 913 N.E.2d 1052, 2009-Ohio-3268 at ¶ 16. (Citing *State v. Ahmed,* Stark App. No.2007-CA-00049, 2008-Ohio-389).

As previously noted Allen's own statements admitted at trial together with the testimony of no less [sic] than four other witnesses established that Allen and Brenson knew and associated with each other in the past. Accordingly, Allen's substantial rights were not violated by the admission of Brenson's statement.

Allen's . . . assignment of error is overruled.

*State v. Allen*, 2010 WL 3784818, at *4-8.

14

The factual findings of the state appellate court are presumed to be correct.

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).   Further, a federal habeas court may not grant relief unless the state court's decision was contrary to or an unreasonable application of clearly established federal law, or based on an unreasonable determination of the facts in light of the evidence that was presented.

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).   The United States Supreme Court has explained:

> "[A]n unreasonable application of federal law is different from an incorrect application of federal law." *Williams v. Taylor*, 529 U.S. 362, 410, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Indeed, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously

15

> or incorrectly." *Id*., at 411, 120 S.Ct. 1495. Rather, that application must be "objectively unreasonable." *Id*., at 409, 120 S.Ct. 1495. This distinction creates "a substantially higher threshold" for obtaining relief than de novo review. *Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007). AEDPA thus imposes a "highly deferential standard for evaluating state-court rulings," *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and "demands that state-court decisions be given the benefit of the doubt," *Woodford v. Visciotti*, 537 U.S. 19, 24, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) ( per curiam ).

*Renico v. Lett*, – U.S. –, 130 S.Ct. 1855,1862 (2010)(footnote omitted.)

> "[C]learly established" law under § 2254(d)(1) consists of "the holdings, as opposed to the dicta, of this Court's" cases. *Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). An "unreasonable application" of that law involves not just an erroneous or incorrect decision, but an objectively unreasonable one. *Renico v. Lett*, 559 U.S. ----, 130 S.Ct. 1855, 176 L.Ed.2d 678 (2010).

*Wong v. Smith*, 131 S.Ct.10 (Mem), 2010 WL 752363, at *2 (Nov. 1, 2010). A state court's determination that a claim lacks merit precludes federal habeas relief so long as "'fairminded jurists could disagree' on the correctness of the state court's decision.'" *Harrington v. Richter*, – U.S. –, –, 131 S.Ct. 770, 786 (2011)(quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Petitioner has failed to meet this standard.

The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to physically confront and cross examine adverse witnesses at all stages of the trial. *Illinois v. Allen,* 397 U.S. 337, 388 (1970). In *Crawford v. Washington,* 541 U.S. 36 (2004), the United States Supreme Court re-defined the test for determining whether admission of hearsay statements violates the Confrontation Clause. The Supreme Court specifically held that the

16

testimonial statements of a witness who does not testify at trial are inadmissible unless the witness was unavailable to testify and the defense had a prior opportunity for cross-examination:

> Where testimonial evidence is at issue ... the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross examination.

*Id.,* at 1366. However, the Supreme Court left untouched the standard governing cases involving nontestimonial hearsay.  "The lynchpin of the *Crawford* decision. . . is its distinction between testimonial and nontestimonial hearsay; simply put, the rule announced in *Crawford* applies only to the former category of statements.... [U]nless a particular hearsay statement qualifies as 'testimonial,' *Crawford* is inapplicable and [*Ohio v.*]  *Roberts* [448 U.S. 56 (1980)] still controls."  *Coy v. Renico,* 414 F.Supp.2d 744, 773 (E.D. Mich. 2006) (citing *United States v. Hendricks,* 395 F.3d 173, 179 (3d Cir. 2005); *Horton v. Allen,* 370 F.3d 75, 83–84 (1st Cir.2004); *United States v. Johnson*, 354 F.Supp.2d 939, 964 (N.D. Iowa 2005); *United States v. Savoca,* 335 F.Supp.2d 385, 391–92 (S.D.N.Y. 2004)). The Supreme Court in *Crawford* declined to spell out a comprehensive definition of the term "testimonial," but stated that, at a minimum, the term includes "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed."  *Crawford,* 124 S.Ct. at 1374. A casual remark to an acquaintance, business records, and statements made in furtherance of a conspiracy do not constitute testimonial statements subject to the strictures of the Sixth Amendment.  *Id.,* at 1364–65, 1367.  Further, "admission of a testimonial statement in and of itself is not enough to trigger a violation of the Confrontation Clause. Instead, the statement must be used as hearsay --

in other words, it must be offered for the truth of the matter asserted." *United States v. Pugh,* 405 F.3d 390, 399 (6th Cir. 2005). A violation of the Confrontation Clause is subject to harmless error review. *Id.,* at 400 (citing *Jordan v. Hurley,* 397 F.3d 360, 363 (6th Cir. 2005)).

For the reasons articulated by the state appellate court, Petitioner's first claim is without merit.

## CLAIM TWO

In claim two, Petitioner asserts that he was denied a fair trial because the trial court refused to sever his trial from that of his co-defendant.  The state appellate court rejected this claim, reasoning as follows:

> Brenson and Allen were jointly indicted on seven counts related to the murder of Norman Herrell. In count one, both men were charged with the aggravated murder of Herrell under R.C. 2903.01(A). In count two, they were charged with the aggravated murder of Herrell under R.C. 2903.01(B). In count three, they were charged with Herrell's murder under R.C. 2903.02(B). In count four, they were charged with kidnapping under R.C. 2905.01(A)(2). In count five, they were charged with kidnapping under R.C. 2905.01(A)(3). In counts six and seven, the men were charged with aggravated robbery, in violation of R.C. 2911.01(A)(3) and R.C. 2911 .01(A)(1), respectively.

> Defendants may be charged in the same indictment, pursuant to Ohio Crim. R. 8(B) as follows:

> "Two or more defendants may be charged in the same indictment, information or complaint if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses, or in the same course of criminal conduct. Such defendants may be charged in one or more counts together or separately, and all of the defendants need not be charged in each count."

18

The law favors the joinder of defendants and the avoidance of multiple trials because joinder conserves judicial and prosecutorial time, lessens the expenses of multiple trials, diminishes the inconvenience to witnesses, and minimizes the possibility of incongruous results from successive trials before different juries. *State v. Thomas* (1980), 61 Ohio St.2d 223, 400 N.E.2d 401.

In order to obtain a severance, a defendant needed to affirmatively demonstrate prejudice by the joinder. Crim.R. 14. Crim R. 14 provides, in pertinent part:

"If it appears that a defendant or the state is prejudiced by a joinder of offenses or of defendants in an indictment, information, or complaint, or by such joinder for trial together of indictments, informations or complaints, the court shall order an election or separate trial of counts, grant a severance of defendants, or provide such other relief as justice requires. In ruling on a motion by a defendant for severance, the court shall order the prosecuting attorney to deliver to the court for inspection pursuant to Rule 16(B)(1)(a) any statements or confessions made by the defendants which the state intends to introduce in evidence at the trial."

The United States Supreme Court has stated, "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States* (1993), 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317. Even where the risk of prejudice is high, "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." *Id.* Indeed, "[a] request for severance should be denied if a jury can properly compartmentalize the evidence as it relates to the appropriate defendants." *United States v. Causey* (6th Cir. 1987), 834 F.2d 1277, 1287. Thus, to prevail on his severance argument, an appellant must show "compelling, specific, and actual prejudice from [the] court's refusal to grant the motion to sever." *United States v. Saadey* (6th Cir. 2005), 393 F.3d 669, 678; *United States v. Driver* (6th Cir. 2008), 535 F.3d 424, 427.

*Allen's Pre-Trial Motion for Relief from Prejudicial Joinder.*

In the case at bar, Allen filed a Motion for Relief from Prejudicial Joinder (Motion # 30) on April 21, 2008, and Brenson filed a Motion to Sever Trial (Motion # 29) on April 25, 2008. The State of Ohio filed responses on April 24, 2008 and April 28, 2008, respectively. On April 30, 2008, the trial court ordered that any statements of Allen and Brenson be provided to the Court under Crim.R. 14. The State filed a Summary of Statements on May 8, 2008, and filed a Supplemental Summary of Statements for Virgil McClendon's Anticipated Testimony on May 14, 2008. Brenson filed a supplemental memorandum in support of his motion to sever on May 12, 2008. Allen filed a response to the State's Summary of Statements on May 15, 2008. The State filed a response to Allen's Response on May 16, 2008. Allen filed a reply thereto on May 19, 2008. The State also filed a response to Brenson's supplemental memorandum on May 19, 2008.

In determining whether to sever the trials of Allen and Brenson, the trial court reviewed the summary of statements filed by the State, in addition to the following: (1) interview with Allen on February 13, 2006; (2) interview with Allen on June 15, 2006; (3) interview with Allen on August 9, 2007; (4) interview with Brenson on January 14, 2003; (5) grand jury testimony of Brenson on April 18, 2002; (6) grand jury testimony of Brenson on April 15, 2008; (7) summary of statements of Allen to Virgil McClendon; and (8) statements of Brenson to Allen contained in letters. Judgment Entry Denying Defendant Allen's Motion for Relief From Prejudicial Joinder (Motion # 30) and Defendant Brenson's Motion to Sever Trial (Motion # 29), filed May 23, 2008 at 2.

In reviewing the grounds submitted in support of the motions, the trial court noted, "Both Defendants maintain that certain statements made by the codefendant may tend to incriminate the other defendant without the opportunity to cross-examine the co-defendant about the statement." Judgment Entry Denying Defendant Allen's Motion for Relief From Prejudicial Joinder (Motion # 30) and Defendant Brenson's Motion to Sever Trial (Motion # 29), filed May 23, 2008 at 4.

After reviewing the relevant case law, the trial court found that Brenson's statements were admissible in a joint trial with Allen.

20

Specifically, the trial court found, "In reviewing Brenson's statements that were provided to the Court, the Court did not find any statements in any of Brenson's interviews or grand jury testimony that incriminated Allen. Brenson did state that he knew Allen and that Allen had worked for him. Brenson also stated that he and Allen went to Arizona and Pittsburgh together on jobs and that they had met in prison. The statements by Brenson that mention Allen merely relate to the relationship between the Defendants. The Court finds that the statements of Brenson that the State intends to introduce at trial are not admissions or confessions that implicate Allen. Therefore, the statements do not pose a substantial threat to Allen's right to confront the witnesses against him. Thus, Allen's Sixth Amendment right to cross-examine witnesses will not be violated by the admission of these statements." Judgment Entry Denying Defendant Allen's Motion for Relief From Prejudicial Joinder (Motion # 30) and Defendant Brenson's Motion to Sever Trial (Motion # 29), filed May 23, 2008 at 4.

The trial court next reviewed copies of letters that Brenson wrote to Allen in the jail. These letters are the basis for the tampering with evidence charge, which is Count 8 in Brenson's indictment. Allen argued that the State intends to use the letter to prove the tampering charge, at least in part on the theory that Brenson knew law enforcement officers would read his letter to Allen. Allen argues that the State intends to use the letter written by Brenson to Allen in an attempt to prove that Allen had connections with the murder scene because he was acquainted with the victim through Brenson and that Allen lied to law enforcement officers when he denied knowing the victim or being in Delaware, Ohio. Judgment Entry Denying Defendant Allen's Motion for Relief From Prejudicial Joinder (Motion # 30) and Defendant Brenson's Motion to Sever Trial (Motion # 29), filed May 23, 2008 at 6.

In ruling that these letters could not be used, the trial court found, "the letter written by Brenson to Allen in August of 2007 will not be admitted at trial. The letter contains statements that implicate Allen, and Allen cannot cross-examine Brenson regarding the statements. Further, the letter written by Brenson lacks credibility as Brenson admits in the letter that he knows law enforcement officers read and copy the mail of the inmates. Thus, Allen will be deprived of his rights under the Confrontation Clause, thereby

21

violating *Bruton,* if the letter written by Brenson implicating him in the crime is introduced at their joint trial, even if the jury is instructed to consider the contents of the letter only against Brenson." *Id.* at 6.

The trial court next reviewed the argument raised by both Allen and Brenson that they will be presenting mutually antagonistic defenses, and thus a joint trial will violate their constitutional rights. Specifically, Allen submits that Brenson's admission of having a long-term relationship with the victim, and to meeting with him in the hours before his death in order to purchase illegal fireworks, would tar Allen's image in the eyes of the jurors. *Id.* at 9. In contrast, Brenson's argument for severance centered upon statements Allen made to his cellmate.[FN6]

FN6. See, *State v. Brenson,* Delaware App. No. 09-CA-18, 2010-Ohio----. See also, Judgment Entry Denying Defendant Allen's Motion for Relief from Prejudicial Joinder (Motion # 30) and Defendant Brenson's Motion to Sever Trial (Motion # 29), filed May 23, 2008; Summary of Statements filed by the state, May 8, 2008; Defendant's Motion # 29 to Sever Trial of [Brenson], filed April 25, 2008.

The trial court ruled, "Allen fails to demonstrate how Brenson's statements regarding his relationship with the victim or his purchase of illegal fireworks from the victim results in the presentation of antagonistic defenses by the defendants ... Moreover, the trial court can give instructions to the jury relating to multiple defendants -- that the jury must separately decide the question of guilt or innocence of each of the defendants -- thereby curing any risk of prejudice in this case." *Id.* at 9.

Our inquiry, however, does not end there. Allen also claims that, as the trial developed, he was substantially prejudiced by the joint trial. In the case at bar, Allen renewed his objection to the trial court's overruling his pre-trial motion to sever prior to the close of the evidence. (13T. at 1810-1812).

22

*Mutually Antagonistic Defenses*

A defendant is not entitled to severance based upon mutually antagonistic defenses unless "there is a serious risk that a joint trial could compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States* (1993), 506 U.S. 534, 539, 113 S.Ct. 933, 937, 122 L.Ed.2d 317.

"A defendant reaches a level of antagonism (with respect to the defense of a co-defendant) that compels severance of that defendant, if the jury, in order to believe the core of testimony offered on behalf of that defendant, must necessarily disbelieve the testimony offered on behalf of his co-defendant. In such a situation, the codefendants do indeed become the government's best witnesses against each other. Where two defendants present defenses that are antagonistic at their core, a substantial possibility exists that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty. *United States v. Berkowitz* (5th Cir.1981), 662 F.2d 1127, 1133. (Internal quotation marks omitted). (Citations Omitted). Accord, *State v. Walters* , Franklin App. No. 06AP-693, 2007-Ohio-5554, at ¶ 23; *State v. Evans,* Scioto App. No. 08CA3268, 2010-Ohio-2554 at ¶ 43.

"Notwithstanding such assertions, the courts have reversed relatively few convictions for failure to grant a severance on grounds of mutually antagonistic or irreconcilable defenses. See, e.g., *United States v. Tootick,* 952 F.2d 1078 (C.A.9 1991); *United States v. Rucker,* 915 F.2d 1511, 1512-1513 (C.A.11 1990); *United States v. Romanello,* 726 F.2d 173 (C.A.5 1984). The low rate of reversal may reflect the inability of defendants to prove a risk of prejudice in most cases." *Zafiro v. United States,* supra 506 U.S. at 538, 113 S.Ct. at 937.

After a thorough review of the record, we find no evidence suggesting that Brenson and Allen intended to present, or did present antagonistic defenses at trial. Rather it is clear in the case at bar that both Brenson and Allen maintained that he had nothing to do with the murder. Neither party presented testimony or evidence to incriminate the other person.

23

Accordingly, based on the record before the trial court when Allen filed his written pretrial motion for relief from prejudicial joinder, we conclude that the trial court did not abuse its discretion in denying that motion on the grounds that Allen failed to show a mutually antagonistic offense resulting in prejudice. Further, we find nothing in the trial court record to demonstrate that either Allen or Brenson presented a mutually antagonistic offense resulting in prejudice at trial.

*Spill Over Doctrine*

Allen argues, in essence that a joint trial prejudiced him because of the gross disparity in the quantity and nature of the evidence against him as compared to that of Brenson. He also asserts that the evidence against Brenson is more damaging than the evidence against him.

In a case involving several defendants, the court must take care that evidence against one defendant is not misinterpreted by the jury and used as the basis for convicting another defendant not connected to the evidence. The existence of ... a "spill-over" or "guilt transference" effect turns in part on whether the numbers of conspiracies and conspirators involved were too great for the jury to give each defendant the separate and individual consideration of the evidence against him to which he was entitled. *United States v. Gallo* (6th Cir.1985), 763 F.2d 1504, 1526. (Citing *United States v. Tolliver* (2nd Cir.1976), 541 F.2d 958, 962). The primary concern is whether the jury will be able to segregate the evidence applicable to each defendant and follow the limiting instructions of the court as they apply to each defendant. *Opper v. United States* (1954), 348 U.S. 84, 95, 75 S.Ct. 158, 165, 99 L.Ed. 101; See, e.g., *Kotteakos v. United States* (1946), 328 U.S. 750, 766-74, 66 S.Ct. 1239, 1248-52, 90 L.Ed. 1557,(number of defendants); *Blumenthal v. United States* (1947), 332 U.S. 539, 560, 68 S.Ct. 248, 257, 92 L.Ed. 154,(trial judge's instructions). *United States v. Flaherty* (1st Cir.1981), 668 F.2d 566, 582; *United States v. Causey* (6th Cir.1987), 834 F.2d 1277.

The phrase "prejudicial to the rights of the accused" means

24

something more than that a joint trial will probably be less advantageous to the accused than separate trials. Such a party must show more than that a separate trial would have given him a better chance for acquittal. *United States v. Gallo,* supra at 1526. The United States Supreme Court has stated, "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States* (1993), 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317.

The violation of one of his substantive rights by reason of the joint trial include: unavailability of full cross-examination, lack of opportunity to present an individual defense, denial of Sixth Amendment confrontation rights, lack of separate counsel among defendants with conflicting interests, or failure properly to instruct the jury on the admissibility of evidence as to each defendant. See *United States v. Camacho* (9th Cir.) 528 F.2d 464, 470, cert. denied, 429 U.S. 995, 96 S.Ct. 2208, 48 L.Ed.2d 819 (1976); *United States v. Fernandez* (9th Cir.2004), 388 F.3d 1199, 1241.

It is difficult to meet this burden by claiming that the jury probably considered evidence against one defendant that was introduced only against another: "juries are presumed to be capable of following instructions regarding the sorting of evidence and the separate consideration of multiple defendants." *United States v. Franklin* (6th Cir.2005), 415 F.3d 537, 556 (citations omitted).

Even where the risk of prejudice is high, "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." *Zafiro v. United States,* supra. Indeed, "[a] request for severance should be denied if a jury can properly compartmentalize the evidence as it relates to the appropriate defendants." *United States v. Causey* (6th Cir.1987), 834 F.2d 1277, 1287. Thus, to prevail on his severance argument, an appellant must show "compelling, specific, and actual prejudice from [the] court's refusal to grant the motion to sever." *United States v. Saadey* (6th Cir. 2005), 393 F.3d 669, 678; *United States v. Driver* (6th Cir. 2008), 535 F.3d 424, 427; Crim.R. 14.

*Admission of Brenson's Statements*
25

In the case at bar, Allen claims that he was prejudiced by the many statements made by Brenson that were admitted into evidence during the trial [FN7]. However, Allen fails to demonstrate how Brenson's out-of-court statements, none of which implicated Allen, prejudiced him. Specifically, Allen contends the jury heard Brenson's grand jury testimony on two different occasions about what happened on the dates and times in question and how it most of it was contradicted by the evidence and statements of other witnesses. [Appellant's Brief at 19]. More specifically, Allen points out that the jury heard,

FN7. Evidence that Brenson and Herrell met while in prison was not objected to at trial. (14T. at 1983-1984). See, *State v. Grubb* (1986), 28 Ohio St.3d 199,203,503 N.E.2d 142. Accordingly, appellant has waived all but plain error. *Puckett v. United States* (2009), --- U.S. ----, ----, 129 S.Ct. 1423, 1428, 173 L.Ed.2d 266.

"Mr. Brenson's statement about there being thirty pounds of marijuana in Mr. "Duck" Herrell's residence and the statements of Mr. Herrell's family that it did not exist;

"Mr. Brenson's statement about having a coat on in July and the Meijer's-receipt failing out;

"Mr. Brenson's statements that he knew Mr. "Duck" Herrell's hiding places and where he kept his money;

"Mr. Brenson's statements about how he knew of the fireworks shipment and his multiple trips obtain them;

"Mr. Brenson's statements about buying fireworks for the last five or six years and reselling them;

"Mr. Brenson's statements about borrowing money to purchase the fireworks;

"Mr. Brenson's multiple stories about what he did with his license plate after the stop by Trooper;

"Mr. Brenson's statements about how he bought zip ties to attach his front license place, and the photograph showing it attached with wire;

"Mr. Brenson's statements about whether or not Mr. "Duck" Herrell assisted him in loading the truck with fireworks;

"Mr. Brenson's statements about whether or not it was raining; and

"Finally Mr. Brenson's statements about when he got home."

[Appellant's Brief at 28-29]. Allen argues that "all of this evidence and the statements of Mr. Brenson that were discredited painted him in a bad light and showed the strength of the State's case against him. All of this evidence spilled over to Appellant because a key part of the State's case against Appellant is that he was Mr. Brenson's right hand man ..." [ *Id.* at 29]. We note that these are the same statements that the trial court ruled were admissible. See, Judgment Entry Denying Defendant Allen's Motion for Relief From Prejudicial Joinder (Motion # 30) and Defendant Brenson's Motion to Sever Trial (Motion # 29), filed May 23, 2008 at 2; 5-6; 9.

In the case at bar, before deliberations, the trial court specifically admonished the jury that "Evidence may be admitted against one defendant, even though it must not be considered as evidence against the other defendant. You must carefully separate such evidence and consider it only as to the defendant to whom it applies.

"A statement by one defendant made outside the presence of the other defendant is admissible as to the defendant making such statement and must not be considered for any purpose as evidence against the other defendant.

27

"You must decide separately the question of whether one or both defendants are guilty or not guilty. If you cannot agree on a verdict as to both defendants, but do agree as to one, you must render a verdict as to the one upon whose guilty or not guilty finding you agree." (17T. at 2588); See also Judgment Entry Denying Defendant Allen's Motion for Relief From Prejudicial Joinder (Motion # 30) and Defendant Brenson's Motion to Sever Trial (Motion # 29), filed May 23, 2008 at 9.

In the absence of any indication that the jury disregarded the court's instructions, we fail to see how the statements made by Brenson, or the claimed inconsistencies between those statements, could substantially have prejudiced Allen. Here, Brenson's statement did not directly implicate or even mention Allen. Brenson neither confessed to the crime himself nor incriminated Allen in his statements. Instead, Brenson asserted that he was not present when the murder was committed. While the weakness of Brenson's statements may implicate him in the crime, it does not implicate Allen. However, even if the statements were found to indirectly incriminate Brenson in the commission of the crimes, the evidence would not warrant a separate trial. "It would impair both the efficiency and the fairness of the criminal justice system to require, in all cases of joint crimes where incriminating statements exist, that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand." *Richardson v. Marsh,* supra, 481 U.S. at 210, 107 S.Ct. 1702, 95 L.Ed.2d 176.

"[A] defendant is not entitled to a severance simply because the evidence against a co-defendant is far more damaging than the evidence against him. As we noted in *United States v. Warner,* 690 F.2d 545, 553 (6th Cir.1982): We recognize that, in a joint trial, there is always a danger that the jury will convict on the basis of the cumulative evidence rather than on the basis of the evidence relating to each defendant. However, we adhere to the view, as previously stated by our court, that [t]he jury must be presumed capable of sorting out the evidence and considering the case of each defendant separately. *Id.* (citations omitted). The presentation of evidence applicable to more than one defendant is simply a fact

28

of life in multiple defendant cases." *Driver,* supra 535 F.3d at 427. (Citing *Causey*, supra 834 F.2d at 1288). (Internal quotation marks omitted).

In *Bruton v. United States* (1968), 391 U.S. 123, 135-136, 88 S.Ct. 1620, 20 L.Ed.2d 476, the United States Supreme Court noted:

" * * * Not every admission of inadmissible hearsay or other evidence can be considered to be reversible error unavoidable through limiting instructions; instances occur in almost every trial where inadmissible evidence creeps in, usually inadvertently. "A defendant is entitled to a fair trial but not a perfect one." * * * It is not unreasonable to conclude that in many such cases the jury can and will follow the trial judge's instructions to disregard such information."

Where, however, "the contested statement is not incriminating to a defendant on its face, but is only so when linked with other evidence at trial, a trial court's limiting instruction is enough to restrain the jury from considering the statement for a purpose that would violate the defendant's right to confrontation." *State v. Wilkerson,* 10th Dist. No. 01 AP-1127, 2002-Ohio-5416, ¶ 43, citing *State v. Laird* (1989), 65 Ohio App.3d 113, 115-17, 583 N.E.2d 323, following *Richardson v. Marsh* (1987), 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176. See, also *State v. Jennings,* Franklin App. Nos. 09 AP-70, 09 AP-75, 2009-Ohio-6840 at ¶ 71.

Even where a trial court violates the *Bruton* rule, "such [a] violation of an accused's right to confrontation and cross-examination is not prejudicial where sufficient independent evidence of an accused's guilt renders improperly admitted statements harmless beyond a reasonable doubt. *State v. Wilkerson,* supra, citing *State v. Moritz* (1980), 63 Ohio St.2d 150, 407 N.E.2d 1268, paragraph two of the syllabus. (Internal quotation marks omitted). See also *Schneble v. Florida* (1972), 405 U.S. 427, 430, 92 S.Ct. 1056, 1059, 31 L.Ed.2d 340.

Finally, the trial court gave specific and correct limiting instructions to restrain the jury from considering the statements for a purpose that would violate the appellant's right to

29

confrontation.[FN8]

FN8. As previously noted, appellant did not object to these instructions and does not challenge them on appeal.

*Brenson's "Other Acts" Evidence*

Allen further argues that he was substantially prejudiced by evidence that was introduced at trial that Allen, the police, the victim and the victim's children knew Brenson not by his true name, but rather by his aliases; that Brenson had used his son's names and social security number when he checked himself into the hospital the day after the murder took place; that Brenson had fathered children while not married and that he had engaged in an extramarital affair. Allen argues that the evidence against Brenson "spilled over" to Allen allowing him to be convicted not on the evidence against him, but the evidence against Brenson.

We begin by noting that the indictment in the case at bar is captioned, in relevant part as "William T. Allen and James A. Brenson, Jr. (AKA James Brenson, Sr., James X. Brenson II, Jonquail Kirkland. James Abdullah Muhammad, Mustafa A. Muhammad, John Noble, James O. Wilson, K.W. Yowpp, K. Wallace Yowpp." (Indictment, filed March 16, 2008). Therefore, it is disingenuous for Allen to argue that he was unaware prior to trial that the state would introduce evidence that Brenson was known by various aliases. Further, we find that Allen made no mention of potential prejudice from the introduction of this evidence in his pre-trial motion to sever.

Brenson has challenged the admissibility of this "other act" evidence in his appeal. See, *State v. Brennon,* Delaware App. No. 09-CA-19, 2010-Ohio---- In that case we found that the evidence that Brenson was known by other names, including "Muhammad" or "Mustafa Muhammad" and "K.W. Kowpp" were not utilized to demonstrate criminal disposition or propensity; rather the evidence demonstrates the connection between Allen and Brenson and between Herrell and Brenson.[FN9]

FN9. Brenson's wife at the time, Robin Muhammad, testified that the couple was Muslim. (16T. at 2355). Accordingly, "Muhammad" may be Brenson's Muslim name and, therefore not an "alias." Further, Brenson identified himself to the grand jury on April 15, 2008 as "James Muhammad." (13T. at 1822).

Specifically, Detective Leatherman testified that he spoke to Allen at his residence (14T. at 2032). He showed Allen some unmarked photographs ( *Id.* at 2033). The first photograph he showed Allen was of Mr. Brenson. ( *Id.* at 2033). Allen identified the photograph as "Muhammad" ( *Id.* at 2033). Allen indicated that he and Brenson were friends ( *Id.* at 2034). Allen indicated that he and Brenson were "good" or "close" friends ( *Id.* at 2034). Allen indicated that he and Brenson had known each other for "quite awhile" ( *Id.* at 2034). Herrell's children also identified a photograph of Brenson as "Muhammad" an individual who knew their father; and lastly when Brenson checked into a hospital the morning after the murder, he used the name Mustafa Muhammad.

The use of the alias "K.W. Kowpp" would also be relevant as it related to the identity of the person [who] signed a Meijer receipt dated June 9, 2000 from a Toledo-area store in the name of K .W. Yowpp, and this receipt was dropped in the victim's home on the night of the murder June 11, 2000.

Accordingly, this evidence is permissible under Rule 404(b). It was not utilized to demonstrate or to establish criminal disposition or propensity; rather the evidence demonstrates the connection between Allen and Brenson and between Brenson and Herrell. The aliases are relevant to prove identification: that the same person who drove a truck from Toledo to Delaware, who dropped a Meijer receipt in the victim's house on the night of the murder, and who sought medical treatment the day after the brutal killing was Brenson despite three different names used.

Further, evidence that Brenson assumed the alias Mustafa Muhammad immediately after the crimes occurred was admissible to show consciousness of guilt, "It is today universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and

31

thus of guilt itself." *State v. Eaton* (1969), 19 Ohio St.2d 145, 160, 48 O.O.2d 188, 196, 249 N.E.2d 897, 906, vacated on other grounds (1972), 408 U.S. 935, 92 S.Ct. 2857, 33 L.Ed.2d 750, quoting 2 Wigmore, Evidence (3 Ed.) 111, Section 276." *State v. Williams* (1997), 79 Ohio St.3d 1, 11, 679 N.E.2d 646, 657. The evidence further served to corroborate Allen's identification of Brenson.

Finally, Brenson admitted to using these names in his conversations with the police. (13T. at 1822; 1834; 1857; 1858). Because Allen was charged with complicity, this evidence was relevant and admissible against Allen.

R.C. 2923.03 provides: "(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:

" * * *

"(2)    Aid    or    abet    another    in    committing    the    offense    ."

R.C. 2923.03(F) states, "A charge of complicity may be stated in terms of this section, or in terms of the principal offense."

"The Supreme Court of Ohio clarified Ohio's position on the issue of complicity in *State v. Perryman* (1976), 49 Ohio St.2d 14, 358 N.E.2d 1040, vacated in part on other grounds sub nom, *Perryman v. Ohio* (1978), 438 U.S. 911, 98 S.Ct. 3136, 57 L.Ed.2d 1156. The court unequivocally approved of the practice of charging a jury regarding aiding and abetting even if the defendant was charged in the indictment as a principal. *Id.* The court held that the indictment as principal performed the function of giving legal notice of the charge to the defendant. *Id.* Therefore, if the facts at trial reasonably supported the jury instruction on aiding and abetting, it is proper for the trial judge to give that charge. *Perryman,* supra at 27, 28, 358 N.E.2d 1040." *State v. Payton* (April 19, 1990), 8th Dist. Nos. 58292, 58346.

R.C. 2923.03(F) adequately notifies defendants that the jury may

be instructed on complicity, even when the charge is drawn in terms of the principal offense. See *State v. Keenan* (1998), 81 Ohio St.3d 133, 151, 689 N.E.2d 929, 946, citing *Hill v. Perini* (C.A.6, 1986), 788 F.2d 406, 407-408. *State v. Herring* (2002), 94 Ohio St.3d 246, 251 762 N.E.2d 940, 949.

"[To] support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." *State v. Johnson* (2001), 93 Ohio St.3d 240, 754 N.E.2d 796, syllabus.

Although the state need not establish the principal's identity, it must, at the very least, prove that a principal committed the offense. *State v. Perryman* (1976), 49 Ohio St.2d 14, 358 N.E.2d 1040, paragraph four of the syllabus; *State v. Hill* (1994), 70 Ohio St.3d 25, 28, 635 N.E.2d 1248, 1251. However, the state does not need to prove that the accomplice and principal had a specific plan to commit a crime. *Johnson,* 93 Ohio St.3d at 245, 754 N.E.2d 796. The fact that the defendant shares the criminal intent of the principal may be inferred from the circumstances surrounding the crime, which may include the defendant's presence, companionship, and conduct before and after the offense is committed. *Id.* at 245-246, 754 N.E.2d 796. This is a situation where "[c]ircumstantial evidence and direct evidence inherently possess the same probative value," *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph one of the syllabus, because "[t]he intent of an accused person dwells in his mind. Not being ascertainable by the exercise of any or all of the senses, it can never be proved by the direct testimony of a third person, and it need not be." *In re Washington,* 81 Ohio St.3d 337, 340, 691 N.E.2d 285, 1998-Ohio-627, quoting *State v. Huffman* (1936), 131 Ohio St. 27, 1 N.E.2d 313, paragraph four of the syllabus.

Finally, we note the jury was aware Brenson used the names "Muhammad" "Mustafa Muhammad" and "K.W. Kowpp." The revelation that he also used the name "Jonquail Kirkland" or "M.A. Muhammad" or "Robin Shabazz" would be merely cumulative.

We find no error, plain or otherwise from the admission of evidence that Brenson was known by other names. We find that there was "no reasonable possibility" that the testimony concerning Brenson's use of these other names contributed to Allen's conviction, and any error was harmless beyond a reasonable doubt. See *State v. Rahman* (1986), 23 Ohio St.3d 146, 151, 492 N.E.2d 401, 407.

We find that appellant did not meet his burden of demonstrating actual prejudice because of the admission of this evidence in a joint trial with Brenson.

*Extra-Marital Affair and Children*

Evidence of Brenson's numerous children and his extra-marital affairs was not used to depict him as a "serial womanizer and adulterer"; rather the evidence was used to impeach Brenson's alibi witness.

In the case at bar, Brenson called his ex-wife Robin Muhammad as an alibi witness. (16T. at 2341). Ms. Muhammad testified that she had been married to Brenson from 1992 through 2002. ( *Id.* at 2344, 492 N.E.2d 401). Ms. Muhammad testified that Allen had worked with Brenson in Toledo and would see him every few months. (16T. at 2346).

Ms. Muhammad testified that she recalled giving Brenson $800.00 around the time of the murder. (16T. at 2359-2360). She testified that this was money that Brenson used to buy fireworks from Herrell. She further testified that she specifically remembers Brenson bringing the fireworks home around the night of the murder. ( *Id.* at 2353, 492 N.E.2d 401). The children were in bed and Brenson put the boxes of fireworks on the kitchen table. (*Id.*). Ms. Muhammad was able to recall that it was raining when Brenson arrived home in Toledo. ( *Id.* at 2354, 492 N.E.2d 401). Ms. Muhammad also testified that Brenson did not have any blood on him, his clothing, or the boxes of fireworks. (16T. at 2356). Ms. Muhammad testified on direct examination that the day after the murder, Brenson checked into the hospital. ( *Id.* at 2357-2358, 492 N.E.2d 401). Further Ms. Muhammad claimed that Brenson had

purchased fireworks from Herrell for three to four years. ( *Id.* at 2359, 492 N.E.2d 401).

On cross-examination, Ms. Muhammad admitted that Brenson checked into the hospital as "Mustafa Muhammad." ( *Id.* at 2361, 492 N.E.2d 401). Further, Brenson listed Ms. Muhammad on the hospital admission form as his unemployed sister despite the fact that she had a job as a home health aide. ( *Id.* at 2362, 492 N.E.2d 401). The prosecution used property records to show that the address he gave the hospital was for a piece of property that Brenson had transferred between his sons' names, Robin's name, and the name Jonquail Kirkland. The prosecution also used BMV records to show that Brenson had used his sons' names and Robin's name to get identification, and had obtained identification using the names Yowpp and Kirkland. (16T. at 2374-75, 2377, 2382-83). The parties stipulated to the medical records. (16T. at 2339; 2398).

The prosecutor then proceeded to delve into Ms. Muhammad's knowledge of Brenson's past and his whereabouts when he was absent from the home.

The prosecutor proceeded to ask Ms. Muhammad about Brenson's whereabouts during the years of 1995 to 1999 and whether she was aware that he was living with a girlfriend, LaLitre, in Florida during that time. (16T. at 2390). Then the prosecutor turned to asking Ms. Muhammad if she knew Holly Lewis. Ms. Muhammad responded, "I think she used to work for a radio station doing advertising." The prosecutor then responded, "Did your husband ever tell you that he and Holly had a long term relationship and he drove down to Columbus about five times a year over a five year period to see her?" ( *Id.* at 2392, 492 N.E.2d 401).

The prosecutor further inquired, "Do you know if they [Brenson's children with LaLitre] were born in the course of your marriage?" Ms. Muhammad responded, "Yes." The prosecution asked, "What about Minimah?" and Ms. Muhammad responded, "yes." The prosecutor then asked Ms. Muhammad, regarding Brenson's children with other women, "I'm up to ten. Do you know how many children he had in total?"

35

The prosecutor proceeded to ask Ms. Muhammad about Brenson's other children and the mothers of those children. If she knew how much time he spent with these other family members.

As previously noted, Brenson admitted to using these names in his conversations with the police. (13T. at 1822; 1834; 1857; 1858). Further, Brenson told the police that he had traveled to Columbus the day before Herrell was murdered to visit Holly Lewis. (13T. at 1836). He described his relationship with Ms. Lewis as "romantic." (*Id.* at 1836-1837, 492 N.E.2d 401). Brenson further stated that he met Ms. Lewis in a motel in Columbus four to five times a year from 1989 through 2000. (13T. at 1838-1839).

The United States Supreme Court described bias as "the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party. Bias may be induced by a witness' like, dislike, or fear of a party, or by the witness' self-interest." *United States v. Abel* (1984), 469 U.S. 45, 52, 105 S.Ct. 465, 83 L.Ed.2d 450. It is fundamental that the bias of a witness may be explored to test credibility. *State v. Gavin* (1977), 51 Ohio App.2d 49, 53, 365 N.E.2d 1263. Furthermore, the potential bias of a witness is always significant in the assessment of the witness' credibility, as "the Trier of fact must be sufficiently informed of the underlying relationships, circumstances, and influences operating on the witness 'so that, in the light of his experience, he can determine whether a mutation in testimony could reasonably be expected as a probable human reaction.'" *State v. Williams* (1988), 61 Ohio App.3d 594, 597, 573 N.E.2d 704, citing 3 Weinstein, Evidence (1988), Section 607[03].

Reasonable cross-examination includes not only the opportunity to impeach a witness: "[c]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness". *Davis v. Alaska,* (1974), 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347, but also the exposure of a witness'

motivation in testifying: 'A more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony.' 3A J. Wigmore Evidence Section 940, p. 775 (Chadbourn rev.1970). We have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination. [415 U.S. 317]". *Greene v. McElroy,* (1959), 360 U.S. 474, 496, 79 S.Ct. 1400, 3 L.Ed.2d 1377. *See also, Davis,* 415 U.S. at 316-317. *Olden v. Kentucky,* (1988), 488 U.S. 227, 109 S.Ct. 480, 102 L.Ed.2d 513; *Delaware v. Van Arsdall* (1986), 475 U.S. 673, 678-679, 106 S.Ct. 1431, 89 L.Ed.2d 674.

Thus, demonstrating to the jury Robin's knowledge and acquiescence in Brenson's providing false information and using false identities was reasonable in assessing her credibility as an alibi witness. Further, her lack of knowledge on many key aspects of Brenson's life suggests that she was unaware of his activities when he was not present within the home. Additionally, her lack of knowledge of Brenson's whereabouts on the day preceding the murder is pivotal in assessing the credibility of her alibi testimony. Contrary to Allen's contentions, the prosecution's questions were relevant concerning Ms. Muhammad's' credibility and possible bias in this case. Evid.R. 616(A) states that "[b]ias, prejudice, interest, or any motive to misrepresent may be shown to impeach the witness either by examination of the witness or by extrinsic evidence." Clearly, these questions were relevant to develop Ms. Muhammad's prejudice or interest in fabricating an alibi to protect him.

This evidence did not discredit Allen personally, and his arguments that the jury used this evidence to convict him are far too speculative and tenuous to rise to the level necessary to show sufficient prejudice warranting a reversal.[FN10] Evidence that is prejudicial only in the sense that it paints the defendant in a bad light is not unfairly prejudicial...." *United States v. Sanders* (6th Cir.1996), 95 F.3d 449, 453.

FN10. The dissent's reliance on *United States v. Breinig* (6th Cir.1995), 70 F.3d 850 is misplaced. In *Breinig,* the defendant was tried jointly with his ex-wife on charges of tax evasion and she was acquitted. At trial, each defendant denied responsibility for evading tax obligations and cast blame on the other. Severance was proper in *Bering* because his wife, who was also his co-defendant, introduced evidence of Bering's bad character in an attempt to exonerate herself and inculpate him. Such was not the case in the case at bar. Neither Brenson nor Allen introduced evidence of the other's "bad character," or sought to prove that the other controlled or dominated him to such an extent that his will was overborne. In fact, Allen's character, unlike Bering's, was never assailed during the trial. Thus, this is not "an extraordinary case" as suggested by the dissent.

Merely because alleged inflammatory evidence is admitted against one defendant, not directly involving another co-defendant, does not in and of itself show substantial prejudice in the latter's trial. See *United States v. Gallo* (C.A.6, 1985), 763 F.2d 1504, 1525. *See also United States v. Causey,* 834 F.2d 1277, 1288 (6th Cir.1987), *cert. denied,* 486 U.S. 1034, 108 S.Ct. 2019, 100 L.Ed.2d 606 (1988) ("[A] defendant is not entitled to a severance simply because the evidence against a codefendant is far more damaging than the evidence against him."); *State v. Smith,* Butler App. No CA2008-03-064, 2009-Ohio-5517 at ¶ 70.

The United States Supreme Court has explained, "When there are few defendants and the trial court is aware of the potential for prejudice, 'the risk of transference of guilt over the border of admissibility [may be] reduced to the minimum' by carefully crafted limiting instructions with a strict charge to consider the guilt or innocence of each defendant independently. [ *Blumenthal v. United States,* 332 U.S. 539, 560, 68 S.Ct. 248, 257]. We cannot necessarily 'assume that the jury misunderstood or disobeyed' such instructions. *Id.,* at 553, 68 S.Ct. at 254. Indeed, this Court's conclusion in *Schaffer* [ (1960), 362 U.S. 511, 80 S.Ct. 945] that defendants failed to show prejudice was based directly on the fact that 'the judge was acutely aware of the possibility of prejudice and was strict in his charge -- not only as to the testimony the jury was not to consider, but also as to that evidence which was available in the consideration of the guilt of each [defendant] separately under the respective substantive counts.' 362 U.S., at

516, 80 S.Ct. at 948. The same caution was exercised by the trial judge here, and no different result should be required." *United States v. Lane* (1986), 474 U.S. 438, 106 S.Ct. 725 at n. 13, 88 L.Ed.2d 814.

The more fundamental problem with Allen's 404(b) position, and his argument based on prejudicial joinder generally, is that it reflects a skepticism about the ability of the Court to craft limiting instructions regarding specific evidence and the ability or inclination of the jury to follow them. "A defendant seeking severance based on the 'spillover' effect of evidence admitted against a co-defendant must also demonstrate the insufficiency of limiting instructions given by the judge." *United States v. Joetzki* (9th Cir.1991), 952 F.2d 1090, 1094. Allen insists that the jury in this case found him guilty of the most serious crime of aggravated murder because he associated with, as Allen argues, "a lying ex-convict, who cheated on his wife." [Appellant's Brief at 30]. This lack of faith in the jury's capacity to follow instructions is contrary to experience and contrary to "the almost invariable assumption of the law that jurors follow their instructions." *Richardson v. Marsh,* 481 U.S. 200, 211, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987) (citing *Francis v. Franklin,* 471 U.S. 307, 325 n. 9, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985)).

"Jurors are called upon to serve in accordance with the law and to decide what facts have been proved and whether they have been proved beyond a reasonable doubt. Citizens do not assume this mantle lightly. Doubts and skepticism may be warranted in measuring the way other parts of government work, but they are unwarranted with [Delaware County] juries. I do not believe that the alleged wrongdoing in this case and any defenses to the alleged wrongdoing are beyond the comprehension of the typical juror. The jury in this case ... approach[ed] their service with great care and attention and will strive to treat each defendant fairly and individually. They [were] given detailed guidance and limiting instructions from the Court." *United States v. W.R. Grace* (Mont 2006), 439 F.Supp. 1125, 1135.

Appellant has not shown that the jury abandoned their oaths, their integrity or the trial court's instructions and found appellant guilty of the most serious crime of aggravated murder because he

associated with Brenson In fact in closing argument to the jury, Allen utilized the theme that he, Allen, in no way tried to hide his identity and that he was only involved in this case because he knew Brenson. (14T. at 2452-2455).

In the case at bar it is difficult to believe that the jury -- aided by instructions -- would have been unable to distinguish between evidence relating to Brenson and evidence relating to Allen.

The evidence introduced that specifically related to Allen included DNA collected from the cuff of the glove matched one-in-thirty people, with one being Allen. Brenson was definitely excluded as a contributor to that DNA. (12T. at 1559-1560; 1582; 1699; 13T. at 1731).

Further, both the victim and Brenson were definitively excluded as sources of DNA found on the blue shirt. ( *Id.* at 1573; 13T. at 1731). Testimony was elicited that the shirt did not belong to Herrell or to any member of his family. (10T. at 1073). That shirt also contained DNA consistent with Allen and his wife. (State's Exhibit 89). The proportion of the population that cannot be excluded as a possible contributor to the DNA on the blue shirt "is one in sixteen million seven hundred and seventy thousand unrelated individuals." (13T. at 1700) FN11. This means that if sixteen million seven hundred seventy thousand people were tested there would be only one person who could not be excluded as a contributor to the DNA sample. ( *Id.*). Every other one of the over sixteen million individuals tested would be excluded as a source of the DNA sample. ( *Id.* at 1701).

FN11. The only reference by appellant as to how this shirt ended up in the home of the victim was that perhaps Brenson left it there. [14T. at 2450-2451]. In the alternative, the crime laboratory investigators contaminated it. [ *Id.* at 2447-2449].

In addition, the DNA from both the blue shirt and the glove was tested and found not to be consistent with three other individuals for whom the police had submitted DNA samples for testing. ( *Id.* at 1575-1576; 1586-1587).

40

The shirt containing DNA consistent with that of Allen and his wife was found inside a home where a murder occurred, two to three feet from the blood soaked glove. (14T. at 1921; 1924; State's Exhibit 2-C). Obviously, the presence in the home of the blue shirt containing Allen and his wife's DNA may be consistent with innocent causes, but the presence of the blue shirt is also consistent with Allen's participation in the crimes.

The courts agree that, " 'DNA testing can provide powerful new evidence unlike anything known before.' *District Attorney's Office for Third Judicial Dist. v. Osborne,* 557 U.S. ----, ----, 129 S.Ct. 2308, 2316, 174 L.Ed.2d 38 (2009).'" *McDaniel v. Brown* (2010), --- U.S. ----, 130 S.Ct. 665, 675, 175 L.Ed.2d 582.

DNA evidence is not "novel" to Ohio courts. In *State v. Pierce* (1992), 64 Ohio St.3d 490, 597 N.E.2d 107, the Court recognized that "the theory and procedures used in DNA typing are generally accepted within the scientific community." 64 Ohio St.3d at 497, 597 N.E.2d 107. Further, the Court held in *Pierce* that "questions regarding the reliability of DNA evidence in a given case go to the weight of the evidence rather than its admissibility. The Trier of fact * * * can determine whether DNA evidence is reliable." *Pierce,* 64 Ohio St.3d at 501, 597 N.E.2d 107. (Emphasis added.) Accord *State v. Nicholas,* 66 Ohio St.3d 431, 437, 613 N.E.2d 225 (1993) ( "DNA results constitute reliable evidence").

Allen does not argue on appeal that the trial court erred in admitting either DNA evidence recovered from the blue shirt or the blood soaked glove found near the blue shirt inside Herrell's home. This additional DNA evidence was corroborating evidence that linked Allen to the commission of this crime.

Two cases are particularly relevant to the Court's current inquiry. First, in *United States v. Bonds,* the Sixth Circuit, in conducting a Rule 403 balancing of certain DNA evidence, found that the evidence was "clearly probative" because it "linked [defendant] to the murder scene when no direct evidence existed to do so." *Bonds,* 12 F.3d at 567. The Court noted, "unfair prejudice" "does not mean the damage to a defendant's case that results from the

41

legitimate probative force of the evidence; rather it refers to evidence which tends to suggest decision on an improper basis." *Id.* at 567. (Internal quotation marks and citations omitted). The Sixth Circuit found that "[t]he aura of reliability surrounding DNA evidence does not present the prospect of a decision based on the perceived infallibility of such evidence, especially in a case such as this where the evidence is largely circumstantial." *Id.* at 567-68.

The DNA evidence collected from the shirt and the glove in the case at bar are similar. That DNA evidence has probative value because it shows that Allen cannot be excluded from that particular article of evidence. Further, it shows that Brenson and the victim can be excluded from a connection to the shirt and further, Brenson can be excluded as a contributor to the DNA recovered from the blood soaked glove. Importantly, the *Bonds* court stressed that "[the] defendants' concern that the jury relied unduly on this circumstantial DNA evidence cannot be resolved by excluding the evidence under Rule 403." *Id.* Rather, "[t]heir concern is accommodated through a Rule 29 motion for judgment of acquittal to assure that the Government produced enough evidence, circumstantial or direct, to support a jury verdict." *Id.* (citing *Daubert,* 509 U.S. at 596, 113 S.Ct. 2786, 125 L.Ed.2d 469 ("the court remains free to direct a judgment and likewise to grant summary judgment") (citations omitted).

*United States v. Hicks,* 103 F.3d 837 (9th Cir.1996), is also particularly relevant. Similar to the instance of low statistical DNA significance in the case at bar concerning the DNA recovered from the blood soaked glove "the PCR testing [in *Hicks* ] did not result in a statistical probability that Hicks contributed to the sample; it *only* concluded that Hicks could not be excluded as a contributor to the sample." *Id.* at 846 (emphasis in original). Upon a Rule 403 analysis of the evidence, the Ninth Circuit found:

"Besides the doubtful prejudice that the single PCR result produced in this case (since none of the three perpetrators could be excluded as possible contributors to the sample), the evidence had the probative value of helping to identify the carjackers. It was almost certainly not sufficient evidence to identify Hicks as one of the carjackers, but it helped to corroborate other evidence of identity to build a wall of evidence supporting that conclusion. The

probative value of the PCR results was not substantially outweighed by the prejudice to Hicks of the evidence." *Id.*

In the case at bar Allen cannot be excluded as contributor to the DNA recovered from the blood soaked glove. As such, the DNA evidence remains probative, and helps to corroborate other evidence and support the state's case as to the identity of the relevant perpetrators. Indeed, the low statistical significance actually benefits Allen, as Allen argued to the jury in his case. Given this avenue of attack, Allen significantly reduced any prejudice or risk associated from the introduction of low-value DNA evidence. However, the jury remained free to assign this evidence whatever weight it deemed proper in arriving at the verdict.

"Questions about the certainty of the scientific results are matters of weight for the jury. For example, in discussing the fact that a hair sampling technique only showed similarities between the hairs and could not show a match with certainty, '[t]he lack of certainty went to the weight to be assigned to the testimony of the expert, not its admissibility, and defense counsel did a creditable job of arguing to the jury that it should be assigned little weight.' *United States v. Brady,* 595 F.2d 359, 363 (6th Cir.1979). And, in general, criticisms touching on whether the lab made mistakes in arriving at its results are for the jury." *United States v. Bonds,* supra at 563.

Further, other evidence was admitted at trial to corroborate the DNA identity evidence. A car dealer in Toledo testified at trial that in April 2000, Allen purchased a car for $600 and then sold it back in July 2000 for $200. Silvy Allen's daughter, Shanica Masadeh, testified at trial that Silvy and Allen suddenly moved to Florida in July 2000, and that Silvy gave custody of her to Silvy's grandmother because Silvy could not support her. The police obtained records from Florida that Allen and Silvy both worked for a temporary agency from August 8, 2000, to December 20, 2000.

James Brenson was originally indicted for the murder of Herrell in Delaware County Common Pleas Case Number 00-CR-I-07-0195 on July 28, 2000. That case was dismissed without prejudice on January 16, 2001, at the request of the prosecution for further investigation. Allen then returned to Ohio in late December, 2000.

"It is today universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself. *State v. Eaton* (1969), 19 Ohio St.2d 145, 160, 48 O.O.2d 188, 196, 249 N.E.2d 897, 906, vacated on other grounds (1972), 408 U.S. 935, 92 S.Ct. 2857, 33 L.Ed.2d 750, quoting 2 Wigmore, Evidence (3 Ed.) 111, Section 276." *State v. Williams* (1997), 79 Ohio St.3d 1, 11, 679 N.E.2d 646, 657.

"There is a lengthy history behind the admission of conduct showing consciousness of guilt. McCormick, Handbook of the Law of Evidence s 271 at 655 (2d ed.1972). As such, flight evidence carries with it a strong presumption of admissibility. See, e.g., *Allen v. United States,* 164 U.S. 492, 499, 17 S.Ct. 154, 156, 41 L.Ed. 528 (1896), where the court said: 'Indeed, the law is entirely well settled that the flight of the accused is competent evidence against him as having a tendency to establish his guilt.' *Id.* at 499, 17 S.Ct. at 156. The cases universally accept this doctrine. *See, e.g., United States v. Greiser*, 502 F.2d 1295, 1299 (9th Cir.1974); *United States v. Ballard,* 423 F.2d 127, 133 (5th Cir.1970)." *United States v. Martinez* (10th Cir.1982), 681 F.2d 1248, 1256-57.

At the conclusion of the evidence in Allen's case, the trial court instructed the jury, " "In this case there's evidence tending to indicate that the defendant, Allen, left the State of Ohio for a time. He moved to Florida and then returned. You're instructed that the evidence in and of itself, does not raise a presumption of guilt. But you may infer, but are not required to infer, a consciousness of guilt. The significance to be attached to this evidence are matters exclusively within the province of the jury." (17T. at 2572).

In the case at bar, the jury could certainly find that Allen's flight here seems strongly probative of his guilt. Further, we also note that the Supreme Court of Ohio has observed that specific intent to commit aggravated murder can be inferred from efforts to avoid detection after the murder's commission. See *State v. Coleman* (1988), 37 Ohio St.3d 286, 525 N.E.2d 792, 797 (citing *State v. Austin* (1976), 52 Ohio App.2d 59, 368 N.E.2d 59, 65-66); see also

44

*State v. Smith* (June 15, 1994), Summit App. Nos. 16027, 16049, at *7 (same); *State v. Fain* (Aug. 22, 1990), Summit App. No. 14578 at *1 (citing *State v. Eaton* (1969), 19 Ohio St.2d 145, 249 N.E.2d 897, 906 (1969)) (noting, generally, that "[f]light from justice, and its analogous conduct, have always been indicative of a consciousness of guilt.") (Citation omitted), vacated in part and remanded, 408 U.S. 935, 92 S.Ct. 2857, 33 L.Ed.2d 750 (1972).

During an interview with the police in 2005 when he was the victim of a felonious assault, Allen informed the police that he was good friends with Brenson FN12. When the police showed Allen a photograph of Herrell, his demeanor noticeably changed. Allen looked at Herrell's picture, put it back and stated that he did not know him. Allen's demeanor was markedly different than when he looked at photographs of other individuals whom he did not recognize. The jury could conclude that this was additional evidence of conduct showing consciousness of guilt.

FN12. This interview occurred before appellant was informed that his DNA was found at the scene of a murder investigation.

Therefore, based on the quantity and strength of the additional evidence against Allen, as well as on his obvious efforts to conceal his crime, which is probative of his intent, we conclude that Allen has not satisfied his burden of demonstrating specific and actual prejudice because of the joint trial with Brenson.

This case presents few complexities. The Court believes that the factual questions and legal concepts at issue are within the competence of an ordinary juror. Further, "juries are presumed to follow their instructions." *Zafiro v. United States,* supra 506 U.S. at 540, 113 S.Ct. at ----. "The rule that juries are presumed to follow their instructions is a pragmatic one, rooted less in the absolute certitude that the presumption is true than in the belief that it represents a reasonable practical accommodation of the interests of the state and the defendant in the criminal justice process." *Richardson v. Marsh* (1987), 481 U.S. 200, 211, 107 S.Ct. 1702, 95 L.Ed.2d 176. See also, *Blumenthal v. United States,* supra 332 U.S. at 559-560, 68 S.Ct. at 257-258; *United States v. Lane* (1986), 474 U.S. 438, 106 S.Ct. 725 at n. 13, 88 L.Ed.2d 814.

45

We decline to hold that a separate trial is necessary whenever any potentially incriminating evidence against one codefendant is introduced during a joint trial. See *Richardson v. Marsh,* supra, 481 U.S. at 209-10, 107 S.Ct. 1702, 95 L.Ed.2d 176. In the absence of a showing to the contrary, the jury is presumed to have followed the instructions of the court. See *Richardson v. Marsh,* supra, at 206, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176.

As such, we conclude that the danger of prejudice due to the "spillover" of evidence, including 404(b) evidence, is insufficient to justify severance for Allen.

Based on the facts disclosed by the record, we are convinced that there is no basis to support a finding that the jurors could not reasonably compartmentalize the evidence as to each of the defendants and properly apply it to the court's instructions in this jury trial. Further, Allen failed to establish that a specific trial right was compromised because of this evidence. He makes only a generalized argument with no factual, specific and actual prejudice argued or demonstrated by the record.

Although the evidence may have been circumstantial, as previously noted, circumstantial evidence has the same probative value as direct evidence. *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492.

Because appellant has not shown that his joint trial subjected him to any legally cognizable prejudice, we conclude that the trial court did not abuse its discretion in denying appellant's motions for relief from prejudicial joinder. *Zafiro,* supra 506 U.S. at 450, 113 S.Ct. at 939.

Accordingly, appellant's. . . assignment of error is overruled.

*State v. Allen*, 2010 WL 3784818, at *8-27.

Again, Petitioner has failed to establish that the decision of the state appellate court

contravened or unreasonably applied federal law as determined by the United States Supreme

Court, or unreasonably applied the facts in light of the evidence that was presented.  28 U.S.C. §

2254(d), (e).

In support of his claim, Petitioner refers to the opinion of the dissenting state appellate

judge, who stated in pertinent part:

> In this case, I would find that Appellant has demonstrated
> prejudice sufficient to show that the jury would not be able to treat
> the evidence separately and distinctively relative to Appellant and
> Brenson. The only evidence linking Appellant to the crime scene
> was his DNA and his wife's DNA found on a shirt at the scene of
> the murder and the fact that he could not be excluded as a DNA
> contributor on the gloves found at the scene. Specifically, State's
> witnesses testified that Appellant had only a 1 in 30 chance of
> being a contributor to the DNA extracted from the glove. To put
> such a statistic into perspective, that means that out of the 105,000
> people that typically attend an Ohio State Buckeyes football game,
> 3,500 would have the same likelihood of being a contributor to the
> DNA found on the glove left at the scene of the murder. While
> admittedly, this evidence in and of itself is circumstantial evidence
> of Appellant's presence at the scene of the murder, I cannot say
> that if Appellant and Brenson were tried separately, that the jury
> would have convicted Appellant of the murder based on this
> evidence alone. In fact, when reviewing the evidence, if Appellant
> and Brenson were tried separately, there is not any direct evidence
> that would place Appellant at the scene of the crime, but for his
> DNA on the one item of clothing and the possibility that he was a
> contributor to the DNA found on the gloves.

> The majority suggests that even if Appellant and Brenson were
> tried separately, the evidence against Brenson would have been
> admissible at Appellant's trial under a theory of complicity. I
> disagree.

> While certainly evidence to establish complicity is admissible at
> separate trials for codefendants, such evidence must still meet the
> threshold requirements of admissibility and relevance. *Bruton v.*

*U.S.* (1968), 391 U.S. 123, 131, 88 S.Ct. 1620, 20 L.Ed.2d 476. It is an important element of a fair trial that a jury consider only relevant and competent evidence bearing on the issue of guilt and innocence.

Evidence that is probative of a defendant's guilt, but technically admissible against only one codefendant can present a risk of prejudice. *Bruton v. U.S.* (1968), 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476. The jury was permitted to hear evidence introduced in the joint trial that would have been impermissible and highly inflammatory against either codefendant if Appellant and Brenson were tried separately. The majority concedes, sub silencio, that much of this evidence was irrelevant and simply does not relate to the crimes with which Appellant has been charged; nor does this evidence inculpate Brenson or Appellant.

First, the majority summarily dismisses as nonprejudicial and cumulative that Brenson used multiple aliases other than K.W. Yowpp. Evidence was admitted that Appellant used the additional aliases of M.A. Muhammad, Muhammad Mustafa [FN16], Jonquail Kirkland, and Robin Shabazz. Admission of these aliases had nothing to do with either Brenson's or Appellant's motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake regarding the charges in the instant case. Rather, they were used to show Brenson's bad character.[FN17] Evidence introduced of use of an alias where the alias is not an integral part of the commission of the crime is a violation of Evid. R. 404. See *State v. Petty* (May 21, 1987), 8th Dist. No. 52069.FN18

FN16. The evidence that Brenson used his son's name to check into the hospital is in no way relevant to the guilt or innocence of Appellant or Brenson, nor does it show consciousness of guilt as the majority now suggest. See majority opinion, ¶ 112. This was not argued as "consciousness of guilt" at trial. More conceivably, the prosecution introduced this evidence to taint Brenson's credibility and imply that he was attempting to not pay his hospital bill by giving faulty information to the hospital.

FN17. References to Brenson's various aliases were discussed at the following pages in the transcript: 554, 1055, 1326, 1347, 1361,

48

1362, 1365, 1389, 1822, 1834, 1857-1858, 1971, 1972, 1977-1979, 1980, 1981, 1984, 2033, 2062, 2212, 2361, 2364, 2366, 2370, 2371, 2373, 2375, 2379, 2382, 2383, 2409, 2416, 2526, 2555; references were also found in the Grand Jury transcript sent back to the jury at pages 17 and 46-47.

FN18. The majority states that Appellant was put on notice of the use of these aliases because in the indictment, the prosecution listed out various aliases of Brenson. An indictment serves only to put a defendant on notice of the crimes with which he is charged. Crim. R. 7(B). It does not serve as a discovery mechanism, nor does it serve to put a defendant on notice that the State would seek to improper[ly] introduce evidence of multiple aliases at trial.

The majority summarily dismisses the prejudice from the admission of evidence that Brenson used multiple social security numbers. Again, admission of such evidence is not relevant to either the prosecution of Brenson or of Appellant. The admission of these social security numbers had nothing to do with Appellant or Brenson's motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake with regard to the charges in the instant case.[FN19] The majority fails to adequately explain how these aliases, social security numbers, and references to Appellant's illegitimate children were relevant to impeaching Brenson's credibility as it went to his use of aliases; rather, the majority sidesteps the issue that such character evidence was not only inadmissible, but also highly prejudicial against both defendants.

FN19. References to various social security numbers used by Brenson can be found at the following pages in the transcript: 1152, 1972, 1976-1977, 1977-1979, 2383, 2422, and 2526.

The majority also rejects the prejudice created by the admission of evidence that Brenson was having an affair with one woman while married to another. Such evidence is highly inflammatory as it relates to both Brenson and Appellant and certainly has no bearing on Brenson's or Appellant's guilt. This is evidence admitted solely to tarnish the reputation of the accused. Moreover, evidence that Brenson had extramarital affairs and that he fathered multiple children with different women is both irrelevant and highly

49

inflammatory. FN20 Again, there is no good faith basis for the admission of such evidence against either codefendant. The prosecutor argued that such information was relevant as it went to "financial situation and motive." FN21 The prosecution then proceeded to ask questions to Brenson's ex-wife, Robin Shabazz, such as "Do you know if they [Brenson's children with Lalitre] were born in the course of your marriage?" to which Shabazz responded, "yes." The prosecution asked, "What about Minimah?" and Shabazz responded, "yes." The prosecutor then asked Shabazz, regarding Brenson's children with other women, "I'm up to ten. Do you know how many children he had in total?" to which Shabazz replied, "eleven." The prosecutor, not satisfied with having Shabazz merely state the answer repeated, "He has eleven children?" (Tr. 2380-2381).

FN20. References during trial to Brenson's illegitimate children and his extramarital affairs can be found at the following pages in the transcript: 508, 1836-1837,1854, 1975, 1976-1977, 1977-1979, 1991, 1995, 2023, 2075, 2086, 2216, 2231, 2249, 2348, 2370, 2379, 2380, 2381, 2390, 2391, 2392; references were also found in the Grand Jury transcript sent back to the jury at page 17, lines 1-13, page 20, and pages 23-24.

FN21. There was never argument by the prosecution, either at trial, or in its brief before this Court, that such evidence was elicited during the cross-examination of Shabazz to impeach or show her bias, as the majority now suggests. See majority opinion, ¶¶ 112, 129.

The prosecutor proceeded to ask Shabazz about Brenson's whereabouts during the years of 1995 to 1999 and whether she was aware that he was living with a girlfriend, LaLitre, in Florida during that time. (Tr. 2390). Then the prosecutor immediately turned to asking Shabazz if she knew Holly Lewis. Shabazz responded "I think she used to work for a radio station doing advertising." The prosecutor then responded, "Did your husband ever tell you that he and Holly had a long term relationship and he drove down to Columbus about five times a year over a five year period to see her?" (Tr. 2392). I cannot comprehend, not can the majority defend, the relevance of this testimony as it relates to the witness's bias in favor of Brenson.

50

Though the prosecutor claimed that this information was essential to establish Brenson's motive (Tr. 2379), during their closing arguments, they did not one time mention that such a motive existed. The majority has reconstructed the State's argument to one of bias, which still fails to adequately defend the admission of such testimony. In fact, the prosecution made clear to ask the court to instruct the jury that "they may find the defendants guilty without knowing their motive, if they find every element proven beyond a reasonable doubt and the state went between that purpose, which I think was somewhat confusing during Mr. McVay's closing." (Tr. 2557). The prosecution also stated, during rebuttal closing, that "I want to be clear about this issue of motive also because Mr. McVay, I think, muddied the waters on that. Motive, ladies and gentlemen, in this case and I think it's fairly clear, is robbery. Whoever did this wanted to steal drugs or money or both and guns and fireworks." (Tr. 2516). Attorney McVay's comment that the prosecutor was referring to was that after listening to nine days of testimony, "only today was it suggested that there was any reason whatsoever why James Brenson would kill Norman Duck Herrell." (Tr. 2467), in reference to the cross examination of Robin Shabazz, who testified that day.

All in all, the references to Brenson's multiple aliases, use of different social security numbers, and his illegitimate children and extramarital affairs totaled sixty-nine.

Additional evidence that was questionable in its admissibility in a joint trial and which would not have been admissible in a trial solely on Appellant's guilt included the evidence that Brenson met Norman Herrell in prison in 1980.FN22 While such testimony would have been relevant to the link between Brenson and Herrell, such evidence would not have been admissible if Appellant was to have been tried separately. Moreover, the introduction of evidence that Brenson's vehicles were searched in October, 1999, and that officers found a shotgun, shotgun shells, walkie talkies, a knife, rubber gloves, duct tape, nylon rope, a ski mask, zip ties, and a "Scream" mask in the vehicles would never have been admissible in a trial against Appellant had he been tried separately. While this evidence was struck from the record after it had been introduced, I find that the majority would be hard pressed to find any case law supporting the admission of such evidence in a trial against a

51

separately tried codefendant. The search of Brenson's vehicle *almost a year preceding* the murder of Herrell was marginally relevant to Brenson's case; relating this evidence to Appellant would require a stacking of inferences upon inferences upon inferences.

FN22. The majority states, in fn. 7 of its opinion, that there was no objection to this testimony at trial. This evidence was objected to prior to trial and was addressed in Appellant's motion to sever. It would be overkill to require a defendant to object to every single statement throughout the course of this trial that would not have been admissible in separate trials.

Additionally, statements by Brenson made outside of trial would not have been admissible in a trial against Appellant. Evid. R. 801(D)(2)(e) provides for the admission of statements of a co-conspirator only if the statements were made during the course of and in furtherance of the conspiracy upon independent proof of the conspiracy.

Specifically, evidence that Brenson testified on two separate occasions in front of the Delaware County Grand Jury and made multiple inconsistent statements regarding the events of June 11, 2000, would not have been admissible in a separate trial. Moreover, Brenson's admission to being in Herrell's residence on June 11, 2000, to purchase illegal fireworks would not have been admissible in a severed trial against Allen; neither would Brenson's statement to police officers that Herrell had 30 pounds of marijuana in his residence on June 11, 2000. Brenson's recounting of his run in with a state trooper the evening of June 11, 2000, wherein he became enraged that the trooper approached him, and wherein Brenson stated during one of his statements to law enforcement that he used zip ties, similar to the type which Herrell was bound with, to secure his license plate onto his truck, would not have been admissible in a trial solely against Appellant under these evidentiary rules. The majority attempts to minimize the prejudice of this testimony by claiming that it is relevant to show that Brenson became enraged at potentially being racially profiled. The majority fails, however, to explain how such testimony is probative of the guilt of Appellant. Brenson's reaction is not related to any fact concerning the crimes of this case. The irrelevance of this interaction between Brenson and the trooper is precisely why the evidence would not have been admissible in a trial against

52

Appellant .FN23

FN23. That is not to say that this evidence would be inadmissible against Brenson in a separate trial.

Additionally, Brenson's statement that he knew where Herrell hid his money in his house, his statement that he knew about Herrell's latest shipment of fireworks and that he had been purchasing fireworks from Herrell for the past five to six years, and his statement that he had to borrow money to purchase the fireworks in 2000 were also irrelevant in the case against Appellant and would not have been admissible in a trial against Appellant had he been tried separately.

The inconsistencies in Brenson's statements regarding what happened when he was pulled over by the trooper on June 11, 2000, would not have been admissible in a trial against Appellant; moreover, Brenson's contradictory statements about it raining the evening of June 11, 2000, would have been inadmissible as well. Brenson's statement that he observed a white van pull up at Herrell's as he was driving away would not have been permitted in a separate trial against Appellant. Finally, testimony from Brenson's previous defense attorney, who was called to testify as to whether he told Brenson that Brenson's first indictment in 2000 would be dismissed against him, would certainly not have been admissible in a separate trial against Appellant.

In cases where the admission of such evidence has been deemed to be harmless, there has consistently been "overwhelming evidence of the defendant's guilt." Such is not the case regarding the evidence against Appellant. Had Appellant and Brenson been tried separately, the evidence linking Appellant to Herrell's murder essentially would have been that he knew James Brenson from Toledo, his and his wife's DNA was found in a shirt at Herrell's house, he had a 1 in 30 possibility of contributing to the DNA found within the gloves at Herrell's house, and that shortly after June 11, 2000, he left Ohio and moved to Florida with his wife, and he moved back to Ohio in late December, 2000.

Thus, the consolidation of Appellant's trial with Brenson's

53

substantially prejudiced Appellant's ability to defend himself. This defect substantially affected his right to a fair trial in that evidence of Brenson's bad character pervaded this joint trial, rendering it virtually impossible for the jury to convict Appellant solely on the evidence presented against him. In other words, the evidence allowed the jury to infer that Appellant, through his association with Brenson, participated in all of the events with Brenson leading up to Herrell's murder on June 11, 2000. See, e.g. *State v. Dixon,* 3rd Dist. No. 8-02-44, 2003-Ohio-2547, (finding plain error to refuse to sever trials of co-defendant spouses where evidence introduced against one spouse allowed jury to infer that both defendants had knowledge of crimes committed).

Moreover, we would note that at no time during the introduction of this evidence in the middle of the trial did the trial court instruct the jury on the limited use of this 404 evidence. It was only during the final jury instructions that the jury was instructed what to do with evidence admitted under Evid. R. 404. If, as a reviewing court, we are always to rely on the fact that a trial court gave a limiting instruction at some time during the trial to cure any potential error, then a court would never be able to reverse on the basis of evidence admitted under 404.

As did the court in *Breinig,* supra, FN24 I believe that this is an exceptional case. The unique facts present one of those very few instances where a conviction is reversed based on a denial of severance under Crim. R. 14. The evidence admitted in the joint trial was highly prejudicial and provided the State with a windfall that it would not have received had the two defendants been tried separately.

FN24. The majority questions my reliance on *Breinig,* claiming that neither Brenson nor Allen introduced evidence "of the other's 'bad character,' or sought to prove that the other controlled or dominated him to such an extent that his will was overborne. In fact, that is true; however, the prosecution did so in this case by repeatedly seeking to prove the co-defendants' bad character.

While I find that Allen should have been granted a separate trial, I am not critical of the trial court's pretrial decision. The court engaged in extensive fact-finding and carefully evaluated the

54

proposed evidence in light of controlling case law and legal standards. However, a trial court has the "continuing duty at all stages of the trial to grant a severance if prejudice does appear". *State v. Bunch,* 7th Dist. No. 02CA 196, 2005-Ohio-3309, ¶ 77, citing *Schaffer v. U.S.* (1960), 362 U.S. 511, 516, 80 S.Ct. 945, 4 L.Ed.2d 921.

On appeal, this Court has the benefit of reviewing the record and evaluating the trial after all the testimony has been presented and the jury has returned its verdict. The trial court could not have foreseen much of the testimony that was ultimately introduced. I would reaffirm today that the decision to deny severance rests within the sound discretion of the trial judge, which a reviewing court does not second-guess. *Breinig,* supra, at 853, citing *United States v. Lasanta*, 978 F.2d 1300, 1306 (2d Cir.1992). However, I would conclude that the facts of this case, as they developed after the trial court's pretrial ruling, severely and unfairly prejudiced Allen and severance was warranted.

The jury's consideration of categorically inadmissible evidence was unfairly prejudicial. It provided the State with a windfall that the rules of evidence and elemental notions of fairness would otherwise not allow, and that Evid. R. 8(B) does not envision. See *Breinig,* supra, at 853.

The majority repeatedly states that Appellant has failed to show "compelling, specific, and actual prejudice" with respect to his severance argument. In so doing, the majority cites to the Sixth Circuit cases of *United State v. Saadey* (6th Cir. 1993), 393 F.3d 669 and *United States v. Driver* (6th Cir. 2008) 535 F.3d 424. Both of these cases deal with federal RICO charges and the severance of charges, not the severance of co-defendants. The majority fails to note that Ohio has not adopted this standard. See e.g., paragraph 203, infra.

Moreover, federal courts have held that state law severance claims are governed by State law, not by federal law. *U .S. v. Hutchinson* (6th Cir.2002), 303 F.3d 720. *Phillips v. Million* (6th Cir.2004), 374 F.3d 395), (wherein federal court pointed out that they must look to Kentucky law to determine whether the motion to grant severance should be granted. In addition, they stated that *Zafiro* involved the interpretation of Federal Rules of Criminal Procedure

8, 14, and 18, not the United States Constitution, and thus *Zafiro* had no precedential weight in reviewing state court proceedings on due process grounds.) *Million,* at 393; see also *Perrou v. Jones* (E.D.Mich. 2009), No. 06-14941, 2009 WL 2392971.

The standard, as cited by the majority, is simply not the standard for establishing severance in Ohio courts. That standard, as set forth in *State v. Torres* (1981), 66 Ohio St.2d 340, 343, 421 N.E.2d 1288, is as follows. "A defendant claiming error in the trial court's refusal to allow separate trials of multiple charges has the burden of affirmatively showing that his rights were prejudiced. *State v. Roberts* (1980), 62 Ohio St.2d 170, 175, 405, 405 N.E.2d 247, N.E.2d 247; * * *.; see also *State v. Hand,* 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151; and *State v. McKnight,* 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315. He must demonstrate that the trial court abused its discretion in refusing to separate the charges for trial. *Opper v. United States* (1954), 348 U.S. 84, 95, 75 S.Ct. 158, 165, 99 L.Ed. 101;  Wright, Federal Practice and Procedure 468, Section 227. More specifically, he has the burden of furnishing the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial." Other courts have held that "error is prejudicial if there is a reasonable probability that the verdict might have been more favorable to the defendant if the error had not been made." *Rolle v. State* (Wyo. 2010), 2010 WY 100, 236 P.3d 259, citing *Vigil v. State* (Wyo. 2010), 2010 WY 15, 224 P.3d 31.

I find it hard to fathom if Appellant has not shown prejudice in the instant case, what it would take in order for any defendant to ever show prejudice. In the trial below, the jury heard over a week's worth of testimony which amounted to approximately 2,200 pages of transcript on review, received approximately 100 exhibits to review, and was charged with determining the guilt of Appellant and his codefendant on multiple complex charges of aggravated murder, murder, kidnapping, aggravated robbery and burglary. The jury deliberated for less than a day, never asked a single question to the court during deliberation and unequivocally convicted both Appellant and his codefendant of all charges carrying life sentences. No greater prejudice could be shown in this case.

> I would therefore find that Appellant has met his onerous burden
> of showing that the prejudice that he suffered was compelling and
> violative of his Due Process rights and would reverse this case on
> the issue of severance.

*State v. Allen*, 2010 WL 3784818, at *36-44.

A trial court's refusal to grant a request for a severance of trials generally constitutes a matter of state law. *See Hutchison v. Bell,* 303 F.3d 720, 731 (6th Cir. 2002); *Brinkley v. Houk*, – F.Supp.2d –, 2011 WL 6029941, at *23 (N.D. Ohio Dec. 5, 2011). Federal habeas corpus relief may be granted in connection with the claim only if Petitioner establishes that he was so prejudiced by error that he was denied a fundamentally fair trial in contravention of his right to due process. *Cooper v. Sowders,* 837 F.2d 284, 286 (6th Cir. 1988); *Sutton v. Bell*, 683 F.Supp.2d 640 (E.D. Tenn. 2010)(citing *Davis v. Coyle,* 475 F.3d 761, 777 (6th Cir. 2007)). In this regard, Petitioner must show more than potential prejudice; he must establish actual prejudice by reason of the joint trial, *see Dowell v. Eckman*, 2006 WL 228933, at *2 (W.D. Ky. Jan. 25, 2006) (citing *Opper v. United States*, 348 U.S. 84 (1954)), as alleged errors in the management of state criminal trials do not deny a defendant due process unless they are "so harmful to the cause of truth that. . . they make the defendant's conviction fundamentally unfair." *Walters v. Sheets*, 2010 WL 7697542, at *13 (quoting *Lewis v. Hutch*, 964 F.2d 670, 676 (7th Cir. 1992)). "Such prejudice may arise when there is a great disparity in the amount of evidence supporting the charges or when the jury is likely to confuse the evidence or infer a criminal disposition on the part of the defendant." *Payne v. Bobby*, No. 2:05-CV-050, 2006 WL 508784, at *9 (S.D. Ohio Feb. 27, 2006)(citing *Webber v. Scott*, 390 F.3d 1169, 1177-78 (10th Cir. 2004)).

In *Zafiro v. United States,* 506 U.S. 534, 538 (1993),  which addressed the issue in terms of the Federal Rules of Criminal Procedure and which was referred to by the state appellate court, the United States Supreme Court held that relief is not warranted on a claim of improper joinder merely because the defendants present mutually antagonistic defenses.  *See also Stanford v. Parker*, 266 F.3d 442, 458 (6th Cir. 2001)(same).  The United States Court of Appeals for the Sixth Circuit has discussed the issue as it relates to Rule 14 of the Federal Rules of Criminal Procedure:

> For the sake of promoting efficiency and avoiding the potential for inconsistent verdicts, joint trials of defendants who are indicted together are actually encouraged rather than discouraged.  *Zafiro v. United States*, 506 U.S. 534, 537 (1993);  see also Fed.R.Crim.P. 8(b)(stating that "[t]wo or more defendants may be charged in the same indictment. . . if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses").  This is especially true when two defendants are accused of participating in a conspiracy or joint scheme.  *United States v. Weiner*, 988 F.2d 629, 634 (6th Cir. 1992).
>
> . . . Severance is required "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."  *Walls*, 293 F.3d at 966 (quoting *Zafiro*, 506 U.S. at 539).  A joint trial of co-defendants who present mutually antagonistic defenses is not prejudicial per se.  *Zafiro*, 506 U.S. at 538.  Moreover, a trial court's limiting instructions may "cure" such prejudice.  *Id*. at 539.

*United States v. Cope*, 3312 F.3d 757, 780 (6th Cir. 2002).

Here, the record fails to reflect that Petitioner and his co-defendant presented mutually antagonistic defenses or that, because of the joint trial, Petitioner was unable to cross-examine witnesses against him.  Although Petitioner prejudicial evidence introduced against Benson, the

state appellate court concluded such evidence was admissible under Ohio law, and the trial court properly instructed the jury regarding the jury's consideration of such evidence in its consideration of the charges against Petitioner. The record simply fails to reflect that the jury disregarded these instructions, or that the issues were so complex that the jury was unable to render a reliable verdict. Further, as noted by the state appellate court, the prosecution presented probative evidence of Petitioner's guilt, including DNA evidence that tended to support the prosecution's contention that Petitioner was at the scene of the crime. In short, this Court is not persuaded that Petitioner has met his burden of establishing that the state appellate court's decision denying this claim was unreasonable so as to warrant federal habeas corpus relief.

Claim two is without merit.

## CLAIM THREE

In claim three, Petitioner asserts that he was denied a fair trial because the prosecutor called his wife, Silvy Allen, to testify as a prosecution witness. After the jury had seen her called to the witness stand, the trial judge – at the request of the prosecutor – excused the jury and inquired whether the witness intended to invoke the marital privilege. She did and was then excused.

Respondent contends that this claim presents an issue regarding a state evidentiary ruling not cognizable on federal habeas corpus review. *Return of Writ*, at 12-13. This Court does not agree. Petitioner argued on direct appeal that the prosecutor's actions in this regard denied Petitioner his right to confront witnesses and a fair trial. *See Exhibit 18 to Return of Writ*. Additionally, the state appellate court, in rejecting this claim, referred to decisions of the United

59

States Supreme Court.  This Court will therefore consider this issue by reference to federal law.

The state appellate court rejected Petitioner's claim, reasoning as follows:

> [A]ppellant. . . argues that the trial court abused its discretion in failing to grant a mistrial after the prosecutor called Silvy Allen to the stand in its case in chief. We disagree.

> Specifically, the facts giving rise to the motion for mistrial were as follows: The State had failed to successfully serve Silvy Allen with a subpoena prior to trial. After the trial had commenced, the prosecutor served Mrs. Allen with a subpoena when she accompanied her daughter to the courthouse to testify. During trial, in front of the jury, the prosecutor proceeded to call Mrs. Allen to the stand to testify. After she took the stand, the prosecutor asked the court if counsel could approach. At a sidebar conference, the following exchange was held:

> "[Prosecutor]: Your Honor, we are approaching prophylacticlly [sic], a thought had occurred that the witness might say at some point that she wished not to testify. Your honor, perhaps we should ask that question when the jury is not present. There is a privilege in this case although they weren't married until 2005, well after the murder, but anything we're asking her about was before they were married, not during covatures. [sic]"

> "The Court: Well, I think we should probably address it before.

> "[Prosecutor]: There's a competency issue that I don't want to come up in front of the jury.

> "The Court: Okay. I'll excuse the jury and we can address it.* * * "

> The following then occurred after the jury was dismissed from the courtroom and the witness was sworn:

> "The Court: Be seated, folks.

"The Court: Do you want to inquire?

" "[Prosecutor]: Your honor, my understanding of the case law in this area, I think it would be appropriate for the court to ask questions of the witness regarding Evidence Rule 601.

"The Court: Your name is Silvy Allen; is that right?

"A: Silvy Sparks Allen.

"Q: Silvy Sparks Allen?

"A: Right.

" * * *

"Q: And you're currently married to Mr. William T. Allen, who is one of the defendants in this case?

"A: That's correct.

"Q: And when were you married?

"A: I'm sorry. Under my stress I'm not going to be totally accurate. Maybe three years ago.

"Q: This is 2008. So 2005 sometime?

"A: Yes.

"Q: And it's my understanding that you're electing to testify today; is that right?

"A: No. And I'm also going to plead the fifth because I wish not to testify against my husband. This subpoena was just given to me momentarily ago. I accompanied my daughter who was subpoenaed.

"Q: Okay. So you refuse to testify?

"A: That's correct.

"The Court: All right, what's your position on this, Mr. [Prosecutor]?

""[Prosecutor]: Your Honor, the strictures of Evidence Rule 601, I think, are pretty clear. I don't know that there's much leeway in this. I guess the only argument I would make -- having reviewed the case law, there's really no good faith argument I can make contrary to that, your honor. The competence issue applies at the time the witness is testifying, which is now and we have no reason to believe they're not married.

"The Court: All right. Any statements for the regard (sic) on behalf of Mr. Allen?

"Mr. Heald: No, your Honor.

"The Court: All right, ma'am. You can step down.

* * *

"Mr. Meyers: * * * We would, in retrospect, lodge an objection to what just transpired here, whereby if the government was aware, as obviously they were, that this witness was going to exercise her right not to testify, they should have brought that to the court's attention before parading her onto the stand. I'm sure I wasn't the only one in the room who watched everybody carefully watching her and now, obviously, they've implied, improperly that for some reason, I suppose not of their own making, they've sent the signal

62

by just her physical presence that she's refused to testify. It's inappropriate and we object and move for a mistrial. It's no different than calling a witness you know who is going to take the Fifth and playing that hand in front of the jury.

"Mr. Heald: Your Honor, we would join in the objection [and] that motion.

"The Court: Does the State want to respond to the objection and motion?

" [Prosecutor]: Your Honor, that's the exact reason I approached the bench before we asked the witness any questions, to address that issue because it popped up. We only served her with her subpoena about five minutes ago.

"Mr Meyers: Clearly, the State must have heard something out in that hallway that caused them to approach the bench. Why they waited until after they had the little parade or charade is inappropriate.

"The Court: I was kind of curious about that myself.

" [Prosecutor]: Your Honor, Mr. Mooney was in the hallway and had a conversation with the witness prior to that, too, and it wasn't raised by anyone else in the room except myself before the witnesses testified.

"Mr. Meyers: We're certainly not privy to the conversations the government or its counsel or it's [sic] chief law enforcement agency has had with her. * * * We have known generally that they've been trying to serve Silvy Allen up in the Toledo area. If they've got a shot to protrusely [sic] drop an immediate subpoena on her and were apparently one or all total, all three together, state representative told by her, I'm not testifying, she most certainly has been paraded in front of this jury. [sic]

" "[Prosecutor]: She didn't say that, your honor. She told us she

63

was refusing to accept a subpoena. Until we found her person and got her served personally with the subpoena, we couldn't force it. But we found her, we served her with a subpoena and she was in court. I had no conversations with her, Miss O'Brien had no conversations with her, Sergeant Leatherman had no conversations with her today.

"Now, the look on her face lead [sic] me to believe that we should approach the bench before her answering any questions. I said something to her about our fair city, she said, "I hate your fair city," or something to that effect. She did not tell me she did not want                                   to                                   testify."

The court, in ruling on the motion for mistrial, stated as follows:

"We have motions for mistrial pending on behalf of both defendants. I think it's the fourth motion for mistrial in this case, feeling that the substantial rights of their clients have been affected by the parading of Miss Allen in here in front of the jury. And then Miss Allen's refusal to testify. Certainly, I agree with counsel that a simple question by Mr. Rohrer, do you wish to testify or not, would have handled it and not brought her in, nor probably the calling of her name in the courtroom, that he was calling her as a witness. And I'm not sure that's akin to putting someone on the stand to plead the Fifth when the prosecutor knows that the witness was going to do that, although it comes pretty close. In this case, the jury was excused and outside the presence of the jury the witness said that she didn't want to testify.

"You know, frankly the court should have anticipated that except I found myself in the same position, wondering if she was coming in the courtroom, then she must be willing to testify. But it's something that is required to do if the spouse is going to testify, to bring them in in advance and say, do you wish to testify; you have a right not to testify. Has substantial prejudice been shown? No, nor has counsel really stated what the substantial prejudice this would be except what inference the jury may or may not take from the fact that she was called in in front of them and then she did not testify. The court is going to give an instruction to the jury and the instruction would either be one that they are not to infer anything from the fact that Mr. Allen's wife refused to testify, or did not

64

testify because our law says a spouse does not have to testify in a trial of her husband, if she so chooses, or the instruction would be that they are not to infer anything from the fact the witness was called to the stand and did not testify. So I can advise them of the law that allows her not to testify, or I can just tell them they're not to infer anything. With that instruction, first of all, I don't think there's any substantial prejudice here to the defendants, but certainly the jury may infer something that they probably shouldn't and what the consequences of that is, no one knows." [13T. at 1789-1795; 1812-13].

At the outset, we note the fact that a witness is under no obligation to speak with the attorney for the state or the attorney for the defense prior to trial FN13. Additionally, had the state called appellant's wife in an effort to create prejudice to appellant's case, the prosecutor could have begun questioning her, forcing her to recite her refusal to testify in front of the jury, or placing damaging evidence under the guise of questioning in front of the jury before asking the trial court to intervene.

FN13. "(I)n modern criminal trials, defendants (as well as prosecutors) are rarely able to select their witnesses: they must take them where they find them." *Chambers v. Mississippi* (1973), 410 U.S. 284, 296, 93 S.Ct. 1038, 1046, 35 L.Ed.2d 297.

Of relevance to this assignment of error, the Ohio Supreme Court has noted that,

"A witness, even though he has previously indicated that he will refuse to testify on the ground that to do so would incriminate him, may be called as a witness.

"As stated in *State v. Snyder* (1953), 244 Iowa, 1244, 1248, 59 N.W.2d, 223:

" 'The general rule is, as stated in 58 Am.Jur. Witnesses, Section 53, that although a witness cannot be compelled to give incriminating testimony, he must if properly summoned appear and be sworn. His privilege is available only as a witness and cannot be extended so as to excuse him from appearing. If the witness

65

himself cannot escape being sworn by claiming in advance that he will refuse to testify, certainly the defendant, against whom such witness is offered, cannot claim greater rights.' See, also, 8 Wigmore on Evidence, 402, Section 2268.

"The possibility that a witness may claim the privilege does not prohibit the prosecutor from asking questions. *Commonwealth v. Granito,* [ (1950), 326 Mass. 494]". *Columbus v. Cooper* (1990), 49 Ohio St.3d 42, 44-45, 550 N.E.2d 937, quoting *State v. Dinsio* (1964), 176 Ohio St. 460, 466, 200 N.E.2d 467. [Internal quotation marks omitted]. See also, *In re M.E.G.,* Franklin App. Nos. 06AP-1256, 06AP-1257, 06AP-1258, 06AP-1259, 06AP-1263, 06AP-1264, 06AP-1265, 2007-Ohio-4308 at ¶ 44. The *Dinsio* court stated that, in a criminal case where a witness properly invokes his right against self-incrimination under the Fifth Amendment, it is improper for the court to prohibit such a witness from being called to the stand, regardless of whether counsel knows that the witness will refuse to testify.

We find that appellant did not suffer any constitutional injury because of the procedure employed in this case. In order to establish a constitutional violation, appellant must show that the prosecution used the witness's assertion of the privilege to create an inference that established a critical element of the state's case. *See Douglas v. Alabama* (1965), 380 U.S. 415, 419, 85 S.Ct. 1074, 13 L.Ed.2d 934. The seminal case concerning the refusal of a witness to testify during a criminal trial is *Namet v. United States* (1963), 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278. In *Namet,* the United States Supreme Court outlined two theories that would support a finding of reversible error when a witness asserts his Fifth Amendment privilege. First, the Court stated that error might be based upon prosecutorial misconduct when the government "makes a conscious and flagrant attempt to build its case out of inferences arising from the use of the testimonial privilege." *Id.* Second, error may arise when, "in the circumstances of a given case, inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant." *Id.*

In applying the two-pronged *Namet* test, courts have considered a number of factors including: the prosecutor's intent in calling the

witness, the number of questions asked that elicit an assertion of the Fifth Amendment privilege, whether defense counsel objects to the prosecutor's conduct, whether the prosecutor attempts to draw adverse inferences in closing argument from the witness' refusal to testify, whether the witness is closely related to the accused, whether the allegedly adverse inferences drawn from an assertion of the testimonial privilege relate to central issues in the case or collateral matters, and whether the inference is the only evidence bearing upon the issue or is cumulative of other evidence. See *Namet,* supra; *Zeigler v. Callahan* (1981), 659 F.2d 254; *Douglas v. Alabama* (1964), 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934; *State v. Carballo* (Oct. 16, 1989), Madison App. No. CA88-02-006.

The Court in *Namet* placed no duty on the prosecutor to determine in advance whether the witness would claim a testimonial privilege,

"In the first place, the record does not support any inference of prosecutorial misconduct. It is true, of course, that [defense counsel] announced that the [witnesses] would invoke their testimonial privilege if questioned. But certainly the prosecutor need not accept at face value every asserted claim of privilege, no matter how frivolous." *Namet,* supra at 179, 188, 373 U.S. 179, 83 S.Ct. 1151, 1155, 10 L.Ed.2d 278.

Here, the record is clear that the state did not improperly pose repeated questions seeking to place before the jury, under the guise of questioning, evidence that was prejudicial to the accused. Rather, the prosecutor upon realizing a problem might occur took the most prudent course of action and requested a side bar out of the hearing of the jury. Under these circumstances, there was no allusion to Ms. Allen's knowledge of the events or of appellant's activities on the evening in question. Ms. Allen's appearance on the witness stand was very brief and her refusal to testify was addressed to the trial court. In the instant case, any inference that the jury may have made from Ms. Allen's refusal to testify not only would have been insufficient to establish a critical element of the state's case, but also would have been merely cumulative of the adequate evidence the state adduced to establish its case.

Further, the court instructed the jury, "When you left, we had a witness on the stand. That witness was a Mrs. Allen, the spouse of Defendant Allen, and under the laws of our state, we have rules, evidence rules, and there's [sic] rules of competency. For example, a person of unsound mind can't testify; a child under the age of ten can't testify. Likewise, a spouse cannot testify. So once I determined she was the spouse, she was not permitted to testify." [13T. at 1812-1813]. Appellant did not object to the trial court's curative instruction at the time it was given, nor does he challenge the correctness or clarity of the curative instruction on appeal [FN14].

FN14. Accordingly, appellant has waived all but plain error. *Puckett v. United States* (2009), --- U.S. ----, ----, 129 S.Ct. 1423, 1428, 173 L.Ed.2d 266.

In the case at bar, we believe the trial court's instruction correctly conveyed to the jury that Ms. Allen had a right not to testify and her decision not to testify must not be considered by the jury for any purpose. That is all the jury really needed to know. As the jury was not being asked to decide the issue of whether the witness had a right to claim a spousal privilege, or whether the spousal privilege applied under the circumstances, the trial judge was not required to give the jury an instruction on spousal privilege. Therefore, his failure to do so cannot be error. The instruction given by the trial court benefitted Allen because the jury was not informed that, for example, Ms. Allen had a Fifth Amendment right to refuse to testify on the grounds that she may incriminate herself. Additionally, the jury was informed that it was not Ms. Allen's decision not to testify; rather she was prevented from testifying by law. We fail to see how the trial court's instruction affected his substantial rights and, in addition how the error seriously affect[ed] the fairness, integrity or public reputation of [the] judicial proceedings. *United States v. Olano* (1993), 507 U.S. at 725,734, 113 S.Ct. 1770; *State v. Perry* (2004), 101 Ohio St.3d 118, 120 802 N.E.2d 643, 646.

As previously noted, "[a] presumption always exists that the jury has followed the instructions given to it by the trial court," *Pang v. Minch* (1990), 53 Ohio St.3d 186, 187, 559 N.E.2d 1313, at paragraph four of the syllabus, rehearing denied, 54 Ohio St.3d 716, 562 N.E.2d 163, approving and following *State v. Fox* (1938), 133 Ohio St. 154, 12 N.E.2d 413; *Browning v. State*

68

(1929), 120 Ohio St. 62, 165 N.E. 566. The appellant has not cited any evidence in the record that the jury failed to follow the trial court's instruction.

Accordingly, we find no error, harmless or otherwise, occurred.

*State v. Allen*, 2010 WL 3784818, at *27-32.

In *Namet v. United States*, 373 U.S. 179 (1963), referred to by the state appellate court, the United States Supreme Court rejected the suggestion that error invariably occurs whenever the prosecution calls a witness who claims a privilege and refuses to answer questions. However, the Supreme Court also noted that error may occur under the concept of prosecutorial misconduct where "the Government makes a conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege," *Id.* at 187, or when "inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant." *Id.* (citations omitted). Such were not the circumstances here.

In *Douglas v. Alabama*, 380 U.S. 415, 416 (1965), the Supreme Court reversed the defendant's convictions where the prosecutor read into evidence, under the guise of cross examination, an entire signed confession of a witness who asserted the Fifth Amendment right not to testify. The Supreme Court concluded that the prosecutor's actions had denied the defendant his constitutional right to cross-examine witnesses against him. *Id.* at 419.     In *Frazier v. Cupp*, 394 U.S. 73, 7331 (1969), however, the Supreme Court rejected a claim under the Confrontation Clause based on the prosecutor's reference to testimony, during opening statements, of a witness who later refused to testify after asserting his rights under the Fifth

Amendment.  The Supreme noted that the prosecutor's reference to the expected testimony of the non-testifying witness was brief and concluded that any potential prejudice had been cured by the trial court's instruction to the jury.

The United States Court of Appeals for the Sixth Circuit, in *Thomas v. Garraghty*, 18 Fed.Appx. 301, 308( unpublished), 2001 WL 1006254 (6th Cir. Aug. 23, 2001), has interpreted these Supreme Court cases to stand for the proposition that, "under certain circumstances, a witness's invocation of the Fifth Amendment privilege before the jury creates the unfavorable inference that the witness and the defendant engaged in criminal conduct together, or that the witness has evidence that inculpates the defendant." *Whitman v. Ludwick,* 2012 WL 651537, at *21.  For the reasons discussed by the state appellate court, this Court concludes that those circumstances were not presented in this case.

The prosecutor did not mention to the jury the substance of Silva Allen's anticipated testimony, nor did he question her in front of the jury.  Instead, the prosecutor requested the trial court to determine,  outside the presence of the jury, whether she intended to invoke her right not to testify against Petitioner.   Moreover, the trial court gave to the jury a limiting instruction that was designed to minimize any prejudice that might otherwise accrue to defendant by reason of his wife's appearance on the witness stand.  "While nothing. . . excludes the possibility that [her] mere presence on the stand could create an inference unfavorable to the defendant which would add critical weight to the prosecution's case," *Whitman v. Ludwick,* 2012 WL 651537, at *22 (citation omitted), her refusal to testify thus "was not a primary source of" an inference indicating Petitioner's guilt.  *Id*.  Petitioner has failed to establish that the prosecutor's actions violated the Confrontation Clause, or that the state appellate court's rejection of this claim was

70

unreasonable.

The record likewise fails to establish that the prosecutor's actions in this regard deprived Petitioner of a constitutionally fair trial. "[M]erely calling a witness to the stand, even knowing that he will assert Fifth Amendment rights, does not rise to the level of constitutional violation." *Thomas v. Garraghty,* 18 Fed.Appx. at 311.

Claim three is without merit.

## CLAIM FOUR

In claim four, Petitioner asserts that he was denied a fair trial based on the admission of testimony from Lieutenant Gorney regarding aliases allegedly used by Brenson  as well as items found in Brenson's cars.  Petitioner acknowledges that the trial court instructed the jury to disregard Gorney's testimony, but he nevertheless contends that the prejudice flowing from Gorney's testimony in this regard could not be undone and that he was denied a constitutionally fair trial as a result.

The state appellate court rejected this claim, reasoning as follows:

> Appellant argues that the trial court should have granted a mistrial after the prosecutor elicited inadmissible evidence during Lieutenant Gorney's testimony regarding items found in Brenson's vehicles in an October 1999 search, including a shotgun, shotgun shells, masks, knives, a D .E.A. hat, rubber gloves, and zip ties.
>
> Before the State called this witness and outside the hearing of the jury, the trial court had ruled that:
>
> "We'll deny defendant's motion in limine allowing Lieutenant Gorney to testify regarding the search in 1999 of Mr. Brenson's vehicle. Obviously, I don't think you need to talk about a search warrant. He can talk about [how] he did a search of the vehicle and

testify, show what he found in that vehicle. Number one, I don't think it is 404(B). It's certainly relevant, if it is 404(B), it may go to the exception for 404(B), and certainly, not a violation of 403." (12T. at 1386). Gorney then testified about items that he found in the vehicle of Appellant's codefendant that included wire ties, cable ties, hunting knives, and gloves. ( Id. at 1393, 165 N.E. 566; 1395).

After Lieutenant Gorney testified, defense counsel requested that Lieutenant Gorney's entire testimony be stricken from the record as being violative of their clients' right to a fair trial. Counsel also requested a mistrial on these grounds. The Court granted the motion to strike the testimony of Lieutenant Gorney, ruling:

"All right, the court will grant the motion to strike the entire testimony. The reason for that is that it was admissible for identification under 404(B), specifically limiting items to knives, gloves, and ties. Unfortunately, there was evidence brought in of a D.E.A. hat, a shotgun, ski mask and so forth, and because of that under 403, although the knives, gloves, and ties were relevant, the probative value is substantially outweighed by unfair prejudice at this point. And there's no way because of the pictures to sort out for the jury the knives, gloves, and ties from the other evidence that is unfairly prejudicial to Mr. Brenson." (12T. at 1535). The court denied the motion for mistrial.

The granting of a mistrial rests within the sound discretion of the trial court as it is in the best position to determine whether the situation at hand warrants such action. *State v. Glover* (1988), 35 Ohio St.3d 18, 517 N.E.2d 900; *State v. Jones* (1996) 115 Ohio App.3d 204, 207, 684 N.E.2d 1304, 1306.

"A mistrial should not be ordered in a criminal case merely because some error or irregularity has intervened * * *." *State v. Reynolds* (1988), 49 Ohio App.3d 27, 33, 550 N.E.2d 490, 497. The granting of a mistrial is necessary only when a fair trial is no longer possible. *State v. Franklin* (1991), 62 Ohio St.3d 118, 127, 580 N.E.2d 1, 9; *State v. Treesh* (2001), 90 Ohio St.3d 460, 480, 739 N.E.2d 749, 771. When reviewed by the appellate court, we should examine the climate and conduct of the entire trial, and reverse the trial court's decision as to whether to grant a mistrial only for a gross abuse of discretion. *State v. Draughn* (1992), 76 Ohio App.3d 664, 671, 602 N.E.2d 790, 793-794, citing *State v.*

*Maurer* (1984), 15 Ohio St.3d 239, 473 N.E.2d 768, certiorari denied (1985), 472 U.S. 1012, 105 S.Ct. 2714, 86 L.Ed.2d 728; *State v. Gardner* (1998), 127 Ohio App.3d 538, 540-541, 713 N.E.2d 473, 475; *State v. Conley*, Richland App. No.2009-CA-19, 2009-Ohio-2903 at ¶ 20.

In evaluating whether the trial judge acted properly in declaring a mistrial, the court has been reluctant to formulate precise, inflexible standards. Rather, the court has deferred to the trial court's exercise of discretion in light of all the surrounding circumstances:

" * * * We think that, in all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes. * * * But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound, and conscientious exercise of this discretion, rests, in this, as in other cases, upon the responsibility of the Judges, under their oaths of office." *United States v. Perez* (1824), 22 U.S. (9 Wheat. 579, 580) 9 Wheat. 579, 22 U.S. 579, 6 L.Ed. 165. *See, also, United States v. Clark* (C.A.2, 1979), 613 F.2d 391, certiorari denied 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (a second prosecution is not barred on double jeopardy grounds when the trial judge had no reasonable alternative to ordering a mistrial in the first trial); *State v. Widner* (1981), 68 Ohio St.2d 188, 190, 429 N.E.2d 1065, 1066-1067.*See also, State v. Conley*, Richland App. No.2009-CA-19, 2009-Ohio-2903 at 22.

In *Illinois v. Somerville* (1973), 410 U.S. 458, 464, 93 S.Ct. 1066, 35 L.Ed.2d 425, the Supreme Court further refined the circumstances under which a trial court can order a mistrial:

"A trial judge properly exercises his discretion to declare a mistrial if an impartial verdict cannot be reached, or if a verdict of conviction could be reached, but would have to be reversed on appeal due to an obvious procedural error in the trial. If an error

would make reversal on appeal a certainty, it would not serve 'the ends of public justice' to require that the Government proceed with its proof when, if it succeeded before the jury, it would automatically be stripped of that success by an appellate court."

After considering the evidence in light of the circumstances under which it was given, and the possible effect of the testimony on the jury, we find the trial court's short, authoritative instruction to the jury sufficed to remedy any possible error regarding the stricken evidence.

At the time the court decided to strike the whole of Lieutenant Gorney's testimony, the court instructed the jury as follows:

"Folks, we heard testimony this morning from Lieutenant Gorney from the Toledo Police Department and at this point in time, I instruct you all to disregard his testimony in full, completely, strike it from your memory, treat it as though you never heard it."

At the conclusion of the trial, the court further instructed the jury,

"A couple of preliminary instructions before I get to the final instructions. Number One, to remind you that you are not to consider Lieutenant Gorney's testimony and the pictures definite to that testimony in making your decision ..." (17T. at 2566).

"Let me emphasize any statements or answers that were stricken by the Court or which you were instructed to disregard are not evidence and they must be treated as though you never heard them. You must not speculate as to why the Court sustained the objection to any question or what the answer to that question might have been." (17T. at 2569).FN15

FN15. Appellant did not object to these instructions nor does he challenge the clarity of these instructions on appeal. Accordingly, appellant has waived all but plain error. *Puckett v. United States* (2009), --- U.S. ----, ----, 129 S.Ct. 1423, 1428, 173 L.Ed.2d 266.

Here, it was not unreasonable, arbitrary, or unconscionable for the trial court to admonish the jury to ignore the stricken testimony rather than grant a mistrial. Curative instructions are presumed to be an effective way to remedy errors that occur during trial. *State v. Treesh, supra,* 90 Ohio St.3d at 480 739 N.E.2d at 771. The trial

judge in this case gave a short, authoritative instruction to the jury on three separate occasions that sufficed to remedy any possible error regarding the struck testimony. A jury is presumed to follow instructions given it by the court. *State v. Henderson* (1988), 39 Ohio St.3d 24, 528 N.E.2d 1237. *See also, State v. Campbell* (1994), 69 Ohio St.3d 38, 51, 630 N.E.2d 339 (where the Court opined that it was implausible for that defendant to argue that the jury determined a capital case based on a minor legal misstatement made by the state during voir dire).

In the present case, the trial court did not abuse its discretion in denying appellant's motion for a mistrial.

*State v. Allen*, 2010 WL 3784818, at *32-35.

The state appellate court  also rejected Petitioner's contention that the admission of

evidence regarding Brenson's use of  alias' denied him a fair trial:

> Brenson has challenged the admissibility of this "other act" evidence in his appeal. See, *State v. Brennon,* Delaware App. No. 09-CA-19, 2010-Ohio---- In that case we found that the evidence that Brenson was known by other names, including "Muhammad" or "Mustafa Muhammad" and "K.W. Kowpp" were not utilized to demonstrate criminal disposition or propensity; rather the evidence demonstrates the connection between Allen and Brenson and between Herrell and Brenson.[FN9]

> FN9. Brenson's wife at the time, Robin Muhammad, testified that the couple was Muslim. (16T. at 2355). Accordingly, "Muhammad" may be Brenson's Muslim name and, therefore not an "alias." Further, Brenson identified himself to the grand jury on April 15, 2008 as "James Muhammad." (13T. at 1822).

> Specifically, Detective Leatherman testified that he spoke to Allen at his residence (14T. at 2032). He showed Allen some unmarked photographs ( *Id.* at 2033). The first photograph he showed Allen was of Mr. Brenson. ( *Id.* at 2033). Allen identified the photograph as "Muhammad" ( *Id.* at 2033). Allen indicated that he and Brenson were friends ( *Id.* at 2034). Allen indicated that he and Brenson were "good" or "close" friends ( *Id.* at 2034). Allen indicated that he and Brenson had known each other for "quite awhile" ( *Id.* at 2034). Herrell's children also identified a

75

photograph of Brenson as "Muhammad" an individual who knew their father; and lastly when Brenson checked into a hospital the morning after the murder, he used the name Mustafa Muhammad.

The use of the alias "K.W. Kowpp" would also be relevant as it related to the identity of the person who signed a Meijer receipt dated June 9, 2000 from a Toledo-area store in the name of K .W. Yowpp, and this receipt was dropped in the victim's home on the night of the murder June 11, 2000.

Accordingly, this evidence is permissible under Rule 404(b). It was not utilized to demonstrate or to establish criminal disposition or propensity; rather the evidence demonstrates the connection between Allen and Brenson and between Brenson and Herrell. The aliases are relevant to prove identification: that the same person who drove a truck from Toledo to Delaware, who dropped a Meijer receipt in the victim's house on the night of the murder, and who sought medical treatment the day after the brutal killing was Brenson despite three different names used.

Further, evidence that Brenson assumed the alias Mustafa Muhammad immediately after the crimes occurred was admissible to show consciousness of guilt, "It is today universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself. *State v. Eaton* (1969), 19 Ohio St.2d 145, 160, 48 O.O.2d 188, 196, 249 N.E.2d 897, 906, vacated on other grounds (1972), 408 U.S. 935, 92 S.Ct. 2857, 33 L.Ed.2d 750, quoting 2 Wigmore, Evidence (3 Ed.) 111, Section 276." *State v. Williams* (1997), 79 Ohio St.3d 1, 11, 679 N.E.2d 646, 657. The evidence further served to corroborate Allen's identification of Brenson.

Finally, Brenson admitted to using these names in his conversations with the police. (13T. at 1822; 1834; 1857; 1858). Because Allen was charged with complicity, this evidence was relevant and admissible against Allen.

R.C. 2923.03 provides: "(A) No person, acting with the kind of

76

culpability required for the commission of an offense, shall do any of the following:

" * * *

"(2) Aid or abet another in committing the offense ."

R.C. 2923.03(F) states, "A charge of complicity may be stated in terms of this section, or in terms of the principal offense."

"The Supreme Court of Ohio clarified Ohio's position on the issue of complicity in *State v. Perryman* (1976), 49 Ohio St.2d 14, 358 N.E.2d 1040, vacated in part on other grounds sub nom, *Perryman v. Ohio* (1978), 438 U.S. 911, 98 S.Ct. 3136, 57 L.Ed.2d 1156. The court unequivocally approved of the practice of charging a jury regarding aiding and abetting even if the defendant was charged in the indictment as a principal. *Id.* The court held that the indictment as principal performed the function of giving legal notice of the charge to the defendant. *Id.* Therefore, if the facts at trial reasonably supported the jury instruction on aiding and abetting, it is proper for the trial judge to give that charge. *Perryman,* supra at 27, 28, 358 N.E.2d 1040." *State v. Payton* (April 19, 1990), 8th Dist. Nos. 58292, 58346.

R.C. 2923.03(F) adequately notifies defendants that the jury may be instructed on complicity, even when the charge is drawn in terms of the principal offense. See *State v. Keenan* (1998), 81 Ohio St.3d 133, 151, 689 N.E.2d 929, 946, citing *Hill v. Perini* (C.A.6, 1986), 788 F.2d 406, 407-408. *State v. Herring* (2002), 94 Ohio St.3d 246, 251 762 N.E.2d 940, 949.

"[To] support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." *State v. Johnson* (2001), 93 Ohio St.3d 240, 754 N.E.2d 796, syllabus.

Although the state need not establish the principal's identity, it must, at the very least, prove that a principal committed the offense. *State v. Perryman* (1976), 49 Ohio St.2d 14, 358 N.E.2d 1040, paragraph four of the syllabus; *State v. Hill* (1994), 70 Ohio St.3d 25, 28, 635 N.E.2d 1248, 1251. However, the state does not need to prove that the accomplice and principal had a specific plan to commit a crime. *Johnson,* 93 Ohio St.3d at 245, 754 N.E.2d 796. The fact that the defendant shares the criminal intent of the principal may be inferred from the circumstances surrounding the crime, which may include the defendant's presence, companionship, and conduct before and after the offense is committed. *Id.* at 245-246, 754 N.E.2d 796. This is a situation where "[c]ircumstantial evidence and direct evidence inherently possess the same probative value," *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph one of the syllabus, because "[t]he intent of an accused person dwells in his mind. Not being ascertainable by the exercise of any or all of the senses, it can never be proved by the direct testimony of a third person, and it need not be." *In re Washington,* 81 Ohio St.3d 337, 340, 691 N.E.2d 285, 1998-Ohio-627, quoting *State v. Huffman* (1936), 131 Ohio St. 27, 1 N.E.2d 313, paragraph four of the syllabus.

Finally, we note the jury was aware Brenson used the names "Muhammad" "Mustafa Muhammad" and "K.W. Kowpp." The revelation that he also used the name "Jonquail Kirkland" or "M.A. Muhammad" or "Robin Shabazz" would be merely cumulative.

We find no error, plain or otherwise from the admission of evidence that Brenson was known by other names. We find that there was "no reasonable possibility" that the testimony concerning Brenson's use of these other names contributed to Allen's conviction, and any error was harmless beyond a reasonable doubt. See *State v. Rahman* (1986), 23 Ohio St.3d 146, 151, 492 N.E.2d 401, 407.

We find that appellant did not meet his burden of demonstrating actual prejudice because of the admission of this evidence in a joint trial with Brenson.

*State v. Allen*, 2010 WL 3784818, at *16-18.

Federal habeas review of state court evidentiary rulings is extremely limited.  *Waters v. Kassulke*, 916 F.2d 329, 335 (6th Cir. 1990).  Evidentiary questions generally do not rise to a constitutional level unless the error was so prejudicial as to deprive a defendant of a fundamentally fair trial, thereby violating due process.  *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *see also Walker v. Engle*, 703 F.2d 959, 962 (6th Cir. 1983).  When such errors are alleged, the federal court's inquiry in reviewing these claims is directed to whether the evidence was rationally connected to the crime charged.  *Carter v. Jago*, 637 F.2d 449, 457 (6th Cir. 1980).  Such were the circumstances here.

Claim four is without merit.

## CLAIM FIVE

In claim five, Petitioner asserts that he was denied a fair trial based on cumulative error.  This claim fails to provide a basis for federal habeas corpus relief.

The Supreme Court has not held that distinct constitutional claims can be cumulated for the purpose of supporting habeas relief.  *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002).  "[W]e have held that, post-AEDPA, not even constitutional errors that would not individually support habeas relief can be cumulated to support habeas relief."  *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005)(citing *Scott v. Elo*, 302 F.3d 598, 607 (6th Cir. 2002).

Claim five is without merit.

## PROCEDURAL DEFAULT

Respondent contends that Petitioner has procedurally defaulted claims six and seven.  In

79

recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required to present those claims to the highest court of the state for consideration. 28 U.S.C. § 2254(b), (c). If the petitioner fails to do so, but the state still provides a remedy to pursue, his or her petition is subject to dismissal for failure to exhaust state remedies. *Id.*; *Coleman v. Thompson,* 501 U.S. 722, 731 (1991); *Deitz v. Money,* 391 F.3d 804, 808 (6th Cir. 2004). If, because of a procedural default, the petitioner can no longer present the relevant claims to a state court, the petitioner also waives the claims for purposes of federal habeas review unless he or she can demonstrate caus e for the procedural default and actual prejudice resulting from the alleged constitutional error. *Edwards v. Carpenter,* 529 U.S. 446, 451 (2000); *Coleman,* 501 U.S. at 724; *Murray v. Carrier,* 477 U.S. 478, 485 (1986).

In the Sixth Circuit, a court must undertake a four-part analysis to determine whether procedural default is a bar to a habeas petitioner's claims. *Maupin v. Smith,* 785 F.2d 135, 138 (6th Cir. 1986); *see also Scuba v. Brigano*, 259 F. App'x. 713, 718 (6th Cir. 2007) (following the four-part analysis of *Maupin*). Specifically, the United States Court of Appeals for the Sixth Circuit requires the district courts to engage in the following inquiry:

> First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply wit the rule. . . . Second, the court must decide whether the state courts actually enforced the state procedural sanction. . . . Third, the court must decide whether the state procedural forfeiture is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim.

*Maupin,* 785 F.2d at 138  (internal quotations omitted).  Finally, if "the court determines that a state procedural rule was not complied with and that the rule [has] an adequate and independent state ground, then the petitioner" may still obtain review of his claims on the merits if he establishes: (1) a substantial reason to excuse the default and (2) that he was actually prejudiced by the alleged constitutional error.  *Id.*  'Cause' under this test "must be something *external* to the petitioner, something that cannot fairly be attributed to him[;] . . . some factor external to the defense [that] impeded [] efforts to comply with the State's procedural rule."  *Coleman*, 501 U.S. at 753.  This "cause and prejudice" analysis also applies to failure to raise or preserve issues for review at the appellate level or failure to appeal at all.  *Id* at 750.

Nevertheless, "'[i]n appropriate cases' the principles of comity and finality that inform the concepts of cause and prejudice 'must yield to the imperative of correcting a fundamentally unjust incarceration.'"  *Murray*, 477 U.S. at 495 (quoting *Engle v. Isacc,* 456 U.S. 107, 135 (1892)).  Petitioners who fail to show cause and prejudice for procedural default may nonetheless receive review of their claims if they can demonstrate that a court's refusal to consider a claim would result in a "fundamental miscarriage of justice."  *Coleman*, 501 U.S. at 750; *see also Lott v. Coyle,* 261 F.3d 594, 601–02 (6th Cir. 2001) (same).  The fundamental miscarriage of justice exception requires a showing that "in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt."  *Schlup v. Delo*, 513 U.S. 298, 329 (1995).

In claim six, Petitioner asserts that he was denied a fair trial because the prosecutor made false statements during closing argument.  In claim seven, Petitioner asserts, *inter alia*, the ineffective assistance of trial counsel because his attorney failed to object to these improper

statements, failed to move for a mistrial, failed to file a motion to suppress DNA evidence, failed to challenge Petitioner's arrest and extradition procedures, and failed to seek discovery.  All these claims, being readily apparent from the face of the record, should have been raised on direct appeal, where Petitioner was represented by new counsel, but were not.  Further, Petitioner may no longer raise such claims in the Ohio courts under Ohio's doctrine of *res judicata*.  *See State v. Cole,* 2 Ohio St.3d 112 (1982); *State v. Ishmail,* 67 Ohio St.2d 16 (1981); *State v. Perry,* 10 Ohio St.2d 175 (1967). The state courts were never given an opportunity to enforce the procedural rule at issue due to the nature of Petitioner's procedural default.

Ohio's *res judicata* rule is adequate and independent under the third part of the *Maupin* test. To be "independent," the procedural rule at issue, as well as the state court's reliance thereon, must rely in no part on federal law. *See Coleman v. Thompson,* 501 U.S. 722, 732–33 (1991). To be "adequate," the state procedural rule must be firmly established and regularly followed by the state courts. *Ford v. Georgia,* 498 U.S. 411 (1991). "[O]nly a 'firmly established and regularly followed state practice' may be interposed by a State to prevent subsequent review by this Court of a federal constitutional claim." *Id.* at 423 (quoting *James v. Kentucky,* 466 U.S. 341, 348–351 (1984)); *see also Barr v. City of Columbia,* 378 U.S. 146, 149 (1964); *NAACP v. Alabama ex rel. Flowers,* 377 U.S. 288, 297 (1964); *see also Jamison v. Collins,* 100 F.Supp.2d 521, 561 (S.D. Ohio 1998).

The Sixth Circuit has consistently held that Ohio's doctrine of *res judicata, i.e.,* the *Perry* rule, is an adequate ground for denying federal habeas relief. *Lundgren v. Mitchell,* 440 F.3d 754, 765 (6th Cir. 2006); *Coleman v. Mitchell,* 268 F.3d 417, 427–29 (6th Cir. 2001); *Seymour v. Walker,* 224 F.3d 542, 555 (6th Cir. 2000); *Byrd v. Collins,* 209 F.3d 486, 521–22 (6th Cir.

2000); *Norris v. Schotten,* 146 F.3d 314, 332 (6th Cir. 1998). Ohio courts have consistently refused, in reliance on the doctrine of *res judicata,* to review the merits of claims because they are procedurally barred. *See State v. Cole,* 2 Ohio St.3d at 112; *State v. Ishmail,* 67 Ohio St.2d at 16.  Additionally, the doctrine of *res judicata* serves the state's interest in finality and in ensuring that claims are adjudicated at the earliest possible opportunity. With respect to the independence prong, it is clear that Ohio's notion of *res judicata* does not rely on or otherwise implicate federal law. Accordingly, the Court concludes that the *Perry* rule is an adequate and independent ground for denying relief.

Petitioner may still obtain review of  the merits of these claims if he establishes cause for his procedural default, as well as actual prejudice from the alleged constitutional violations.

> " '[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him[;] ... some objective factor external to the defense [that] impeded ... efforts to comply with the State's procedural rule." *Coleman v. Thompson,* 501 U.S. 722, 753, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

*Maples v. Stegall*, 340 F.3d 433, 438 (6th Cir.2003). The constitutionally ineffective assistance of counsel may constitute cause for a procedural default, so long as such claim has been presented to the state courts and is not, itself, procedurally defaulted.  *Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000) (citing *Murray v. Carrier*, 477 U.S. 478, 488–89 (1986)).

In claim seven, Petitioner alleges not only the ineffective assistance of trial counsel but also the ineffective assistance of appellate counsel.  This claim of ineffective assistance of appellate counsel is, however, procedurally defaulted and therefore cannot serve as cause for Petitioner's failure to raise his claim six and his claim of ineffective assistance of trial counsel on

direct appeal.  Petitioner filed an application to reopen the appeal pursuant to Ohio Appellate

Rule 26(B) in which he asserted the ineffective assistance of appellate counsel; however, the

state appellate court denied his Rule 26(B) application as untimely:

> Our original judgment was filed on September 28, 2010, and
> appellant's application was filed on January 6, 2012.  Accordingly,
> appellant's application was not timely filed within ninety (90) days
> of the journalization of our opinion in appellant's case.  Appellant
> does not give a reason for his delayed filing.
>
> The Ohio Supreme Court has interpreted App.R. 26 and App.R.
> 14, stating that both were "intended to allow the belated
> presentation of colorable claims that defendants/appellants were
> prevented from presenting timely by particular circumstances.
> Lack of effort or imagination, and ignorance of the law, are not
> such circumstances and do not automatically establish good cause
> for failure to seek timely relief." . . . .
>
> An applicant has no right to counsel in filing the application, and
> he does not show good cause if he has no counsel to submit a
> timely app.R. 26(B) application. . . .
>
> The Supreme Court has upheld judgments denying applications for
> reopening solely on the basis that the application was not timely
> filed and the applicant failed to show "good cause for filing at a
> later time." . . . .

*Exhibit 29 to Return of Writ.*    Although the state appellate court alternatively considered and

dismissed petitioner's claim on the merits, that alternative ruling does not forgive the waiver or

otherwise revive Petitioner's claim for habeas corpus review.  *See Harris v. Reed,* 489 U.S. 255,

264 n. 10 (1989) ("a state court need not fear reaching the merits of a federal claim in an

*alternative* holding"); *Bowling v. Parker*, 344 F.3d 487, 498 (6th Cir. 2003) (where state court's

dismissal of claim on merits constitutes an alternative holding, federal habeas court will consider

the claim procedurally defaulted).  Moreover, Petitioner subsequently failed to timely appeal the appellate court's denial of his Rule 26(B) application to the Ohio Supreme Court, and Ohio does not permit delayed appeals in Rule 26(B) proceedings.  Ohio Supreme Court Rule of Practice 2.2(A)(4)(c).

In sum, Petitioner has failed to establish cause for his procedural default of claims six and seven.

Beyond the four-part *Maupin* analysis, this Court is required to consider whether this is "an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent."  *Murray v. Carrier,* 477 U.S. at 491; *see also Sawyer v. Whitley,* 505 U.S. 333.  The record fails to reflect such circumstances here.

Claims six and seven are therefore procedurally defaulted.

**WHEREUPON**, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED**.

### PROCEDURE ON OBJECTIONS

If any party objects to this *Report and Recommendation,* that party may, within fourteen (14) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further

evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo,* and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir.1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

*   s/ Norah McCann King*
Norah McCann King
United States Magistrate Judge

December 7, 2012